**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 94-40159

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

VERSUS

ROHN MARTIN ISHMAEL and
DEBRA K. ISHMAEL,

Defendants-Appellees.

Appeal from the United States District Court
For the Eastern District of Texas

(March 15, 1995)

Before REYNALDO R. GARZA, DeMOSS, and BENAVIDES, Circuit Judges.

DeMOSS, Circuit Judge:

Based on the readings from a thermal imager, along with other circumstantial evidence, federal law enforcement officers obtained a warrant to search the premises of Rohn Martin Ishmael and his wife, Debra K. Ishmael. The officers executed the warrant and discovered some firearms and 770 marijuana plants. After being indicted, the Ishmaels moved to suppress the evidence on the ground that the warrantless use of the thermal imager was a constitutionally proscribed search. The district court granted the Ishmaels' motion to suppress. We now reverse.

The warrant in this case was based upon the following information: In the late summer of 1992, a confidential source informed Paul Black, a Drug Enforcement Administration ("DEA") officer, that he/she had delivered numerous truck loads of concrete re-mix to the Ishmaels' secluded, rural property in Nacogdoches County, Texas. The Ishmaels, according to the source, took inordinate measures to conceal the need for the concrete. Rohn Ishmael, for example, would manually mix the concrete near the source's truck and then drive the concrete to another location on the property. His suspicions aroused, Black entered the property and saw two mobile homes and a trailer. Black, however, did not witness any illegal activity.

In August 1993, Black resumed his investigation. He and three other officers returned to the property and followed a roughly built road from the front of the property to a steep embankment where a large hole had been made. They observed around 60 empty bags of cement, a dump truck and a concrete re-mixer parked near the hole. The next day, Black investigated Rohn Ishmael's criminal record and found at least four separate marijuana-related incidents dating back to 1974, several of which involved the cultivation of marijuana. Black, along with other DEA officers, then surveyed the Ishmaels' property by air. They observed a mobile home and a large steel building, separated by about 200 to 300 yards. The steel building stood next to a 2-acre pond. Black entered the property on foot two more times. He discovered that the Ishmaels had built

a structure beneath the steel building. The substructure was wired for electricity and was being fed water from the nearby pond by way of exposed rubber tubes and a water pump. The substructure also had an exhaust fan, which Black noticed was continuously running. Black also observed a nearby pallet containing 100 5-gallon plastic buckets.

Suspecting that the Ishmaels were cultivating marijuana in the structure beneath the steel building, the DEA boarded a helicopter with a thermal imager and flew over the Ishmaels' property at approximately 500 to 1000 feet. A thermal imager detects differences in surface temperature of targeted objects and displays those differences through a viewfinder in varying shades of white and gray. In other words, a warm object will appear white on the device's viewfinder, whereas a cool object will appear gray. The device can record its readings on a standard videocassette. The DEA's recording of the Ishmaels' property showed that, although the water entering the substructure was noticeably cool, the water exiting it was emitting a substantial amount of heat. The recording additionally showed that the ground adjacent to the substructure was much warmer than the ground further from the substructure.

Black then subpoenaed the Ishmaels' telephone records. The records indicated that the Ishmaels had made numerous calls to various horticulture shops, two of which appeared on a narcotics intelligence computer base as suppliers for other marijuana cultivators. Black also subpoenaed the Ishmaels' electrical

utility records.  The records showed that the substructure's power usage was extremely high and far exceeded the mobile home's power usage.

In September 1993, Black and several other officers again entered the Ishmaels' property on foot.  Using a hand-held thermal imager, the officers canvassed the perimeter of the steel building but never entered it.  The officers made essentially the same findings; an unusual amount of heat was emanating from the substructure and the ground adjacent to it.  Black displayed his recordings to two DEA thermographers, both of whom concluded that the Ishmaels were illegally cultivating marijuana in the steel building's substructure.  The DEA then used the thermal imager's readings, along with the wealth of information gathered by Black, to obtain a warrant to search the steel building and its substructure on the Ishmaels' property.  The officers executed the warrant two days later and uncovered 770 marijuana plants and several firearms.  After being indicted in October 1993, the Ishmaels moved to suppress the evidence obtained pursuant to the search warrant.  They argued that the readings from the thermal imager constituted an unconstitutional search and that, without those readings, the DEA did not have probable cause to obtain a warrant.

The district court granted the motion to suppress in January 1994.  See United States v. Ishmael, 843 F. Supp. 205 (E.D. Tex. 1994).  The court employed a burden-shifting analysis. The burden, it observed, initiated with the Ishmaels to demonstrate that they

4

had a reasonable expectation of privacy. The court concluded that, although the steel structure was outside the curtilage of the home, the Ishmaels nonetheless had exhibited a reasonable expectation of privacy. Id. at 209-12. Specifically, it noted that "the Ishmaels had a reasonable expectation that their effects, associated with the secreted metal building and the business being conducted there, were safe from [g]overnmental surveillance." Id. at 211. Pointing to Florida v. Riley, 488 U.S. 445 (1989), and California v. Ciraolo, 476 U.S. 207 (1986), the government argued that the Ishmaels did not have a reasonable expectation of privacy from the DEA's air surveillances. The court rejected the government's argument, reasoning that those cases were limited exclusively to naked-eye observations. Id. at 211-12.

According to the district court, the burden then shifted to the government to prove that its search fell within one of the several recognized exceptions to the warrant requirement. The government, relying on Dow Chemical Company v. United States, 476 U.S. 227 (1986), argued below that the heat emissions were in "plain view." The court rejected the "plain view" argument on the ground that the heat emissions would not be in plain view without the use of "sophisticated technology," namely the thermal imager. Id. at 212. Alternatively, the government analogized the heat emissions to curb-side garbage (as in California v. Greenwood, 486 U.S. 35 (1988)) and the scent of cocaine emanating from luggage (as

5

in <u>United States v. Place</u>, 462 U.S. 696 (1983)): because each has been effectively abandoned, the defendant no longer has a subjective expectation of privacy in its concealment. The court rejected the government's analogies on the ground that the relative sophistication of the thermal imager poses a greater intrusion than officers manually rummaging through abandoned garbage or a trained police dog alerting to a suitcase carrying contraband. <u>Id</u>. at 212-13.

Having found that the use of the thermal imager constituted a search proscribed by the Fourth Amendment, the court proceeded to determine whether the remaining evidence amounted to probable cause. The court noted that the DEA had no direct evidence of illegal activity taking place on the Ishmaels' property. <u>Id</u>. at 213-14. The court stated, "The evidence of their activity was consistent with developing a new patented strain of African violets, and innumerable other perfectly legal activities." <u>Id</u>. at 214. On this basis, the court concluded that a judge would not find that probable cause existed for issuing a warrant, and it therefore granted the Ishmaels' motion to suppress. The government now appeals the district court's holdings that the warrantless use of the thermal imager was unconstitutional and that, absent its readings, probable cause did not exist for the issuance of the warrant.

II.

A.

In reviewing a district court's ruling on a motion to suppress, we review the court's conclusions of law de novo and its findings of fact for clear error. United States v. Cardenas, 9 F.3d 1139, 1147 (5th Cir. 1993); United States v. Sanders, 994 F.2d 200, 202-03 (5th Cir. 1993). Furthermore, we view the evidence in a light most favorable to the prevailing party, United States v. Piaget, 915 F.2d 138, 140 (5th Cir. 1990), which in this case is the Ishmaels.

B.

The warrantless use of thermal imagers by the police has spawned a fair amount of search and seizure jurisprudence over the last several years.[1] Though the Fifth Circuit has yet to squarely address this issue,[2] three of our sister circuits have, and each

---

[1]See United States v. Myers, ___ F.3d ___, 1995 WL 38118 (7th Cir. 1995); United States v. Robertson, 39 F.3d 891 (8th Cir. 1994); United States v. Kyllo, 37 F.3d 526 (9th Cir. 1994); United States v. Ford, 34 F.3d 992 (11th Cir. 1994); United States v. Pinson, 24 F.3d 1056 (8th Cir. 1994); United States v. Olson, 21 F.3d 847 (8th Cir. 1994); United States v. Deaner, 1 F.3d 192 (3d 1993); United States v. Feeney, 984 F.2d 1053 (9th Cir. 1993); State v. Young, 867 P.2d 593 (Wash. 1994); United States v. Field, 855 F. Supp. 1518 (W.D. Wis. 1994); United States v. Domitrovich, 852 F. Supp. 1460 (E.D. Wash. 1994); United States v. Porco, 842 F. Supp. 1393 (D. Wyo. 1994); United States v. Deaner, 1992 WL 209966 (M.D. Pa. 1992); United States v. Kyllo, 809 F. Supp. 787 (D. Or. 1992), vacated on other grounds, 37 F.3d 526 (9th Cir. 1994); United States v. Penny-Feeney, 773 F. Supp. 220 (D. Haw. 1991), aff'd on other grounds, 984 F.2d 1053 (9th Cir. 1993); see also Lisa J. Steele, Waste Heat and Garbage: The Legalization of Warrantless Infrared Searches, 29 CRIM. L. BULL. 19 (1993).

[2]In United States v. Broussard, 987 F.2d 215 (5th Cir. 1993), the defendant moved to suppress certain evidence on the ground that the affidavit the government submitted in requesting a warrant was insufficiently detailed. In affirming the district court's denial of the motion, we noted that, to the extent that the affidavit was inadequate, the warrant was nonetheless valid because the government had supplied findings from a thermal imaging device.

has concluded that such use is not a "search" proscribed by the Fourth Amendment. United States v. Myers, 1995 WL 38118, at \*2-\*3 (7th Cir. 1995); United States v. Ford, 34 F.3d 992, 995-97 (11th Cir. 1994); United States v. Pinson, 24 F.3d 1056, 1058-59 (8th Cir. 1994). We now hold that the warrantless use of a thermal imager in an "open field" does not violate the Fourth Amendment.

1.

The Fourth Amendment provides in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. As in any Fourth Amendment surveillance case, our analysis begins with Katz v. United States, 389 U.S. 347 (1967). The Supreme Court in Katz enunciated its two-prong test for determining whether a warrantless search violated a defendant's legitimate expectation of privacy: the defendant must have exhibited a subjective expectation of privacy, and that expectation must be one society is prepared to recognize as reasonable. Id. at 361 (Harlan, J., concurring); see also Ciraolo, 476 U.S. at 211 (majority opinion). With regard to the first prong, the government maintains that the Ishmaels did not exhibit a subjective expectation of privacy because they made no effort to conceal the heat emanating from the building. In fact, the Ishmaels encouraged emission of the heat by installing an exhaust fan that operated

---

Id. at 222. Because the defendant did not challenge the constitutionality of the warrantless use of the device, we did not address the issue. See also United States v. Zimmer, 14 F.3d 286, 288 (6th Cir. 1994).

8

continuously. Thus, the government argues, the Ishmaels clearly failed Katz' first prong because "[w]hat a person knowingly exposes to the public, even in his home or office, is not a subject of Fourth Amendment protection." Katz, 389 U.S. at 351. The Ishmaels, in response, contend that the government's argument is somewhat specious; while the substructure admittedly was emitting heat, that emission was not a deliberate act. The law of physics, and not the Ishmaels' failure to contain, controlled the emission of heat from the substructure. The Ishmaels argue that the government's "heat waste" analogy therefore is a bad one because one who expects his garbage to remain private can refrain from leaving it at the curb, whereas one who expects his heat waste to go undetected can only hope the police is not presently scanning his property with a thermal imager.

In cases involving very similar facts, other courts have readily accepted the heat waste analogy in concluding that the defendants' have failed to satisfy Katz' first prong. See, e.g., Myers, ___ F.3d at ___; Ford, 34 F.3d at 995; Domitrovich, 852 F. Supp. at 1472-73; Penny-Feeney, 773 F. Supp. at 225-26. But a cursory review of Katz itself demonstrates that the first prong probably is not as restrictive as these courts have interpreted it to be. In Katz, the government, without a warrant, attached a recording device to the exterior of a telephone booth that the defendant used to illegally transmit gambling information. The defendant argued that the government's warrantless eavesdropping was proscribed by the Fourth Amendment, and the Supreme Court

9

agreed.  Though the defendant in Katz did not take every precaution against electronic eavesdropping, the Court nonetheless concluded that he had exhibited a subjective expectation of privacy.  Katz, 389 U.S. at 353 (the government's warrantless eavesdropping "violated the privacy upon which [the defendant] justifiably relied while using the telephone booth") (majority opinion).  Likewise, in Ciraolo, the defendant was cultivating marijuana in his backyard, which was enclosed by a six-foot outer fence and a ten-foot inner fence.  Because the fences obstructed its view from ground level, the police flew over the defendant's property at 1,000 feet and observed the marijuana patch.  Though it ultimately concluded that the search was constitutional, the Court initially concluded that the defendant "[c]learly . . . ha[d] met the test of manifesting his own subjective intent and desire to maintain privacy as to his unlawful agricultural pursuits."  Ciraolo, 476 U.S. at 211; see also Riley, 488 U.S. at 449 ("We recognized [in Ciraolo] . . . that the occupant had a subjective expectation of privacy.  We held, however, that such an expectation was not reasonable.").[3]

Thus, unless we intend to render Katz' first prong meaningless, we must conclude that the Ishmaels exhibited a

_____

[3]Riley is further proof that a dweller need not guard against every possibility of detection in order to satisfy Katz' first prong.  The defendant in Riley was cultivating marijuana in a greenhouse that was missing several corrugated roofing panels. Flying over the greenhouse in a helicopter at 400 feet, the police observed marijuana through an opening in the roof.  The Court found that the defendant "no doubt intended and expected that his greenhouse would not be open to public inspection."  Riley, 488 U.S. at 450.  But concluding that Ciraolo was controlling, the Court held that the search was nonetheless reasonable.

10

subjective expectation that their hydroponic laboratory would remain private. See Smith v. Maryland, 442 U.S. 735, 740 n.5 (1979) ("[s]ituations can be imagined, of course, in which Katz' two-pronged inquiry would provide an inadequate index of Fourth Amendment protection").[4] Though the Ishmaels did not -- indeed, could not -- take every precaution against the detection of the hydroponic laboratory, the balance of the evidence demonstrates that the Ishmaels exhibited a subjective expectation of privacy. Rohn Ishmael, for example, constructed the laboratory in great secrecy. In addition, it was built as a basement to a steel building that was not visible from a public road. We therefore conclude that the Ishmaels have satisfied Katz' first prong.

### 2.

We now must address whether the government's intrusion on the Ishmaels' subjective expectation of privacy with a thermal imager is a reasonable one. Oliver v. United States, 466 U.S. 170, 182-83 (1984) ("the correct inquiry is whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment"). It is at this point in the analysis that the use of technology, and its degree of sophistication, becomes an issue, because more sophisticated forms of technology increase the likelihood that their warrantless use will constitute an

---

[4]See also 1 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 2.1(c), at 308-310 (2d ed. 1987) (generally arguing that courts should avoid the contemplation of unreasonable hypotheticals when applying the first Katz prong); David H. Steinberg, Constructing Homes for the Homeless?  Searching for a Fourth Amendment Standard, 41 DUKE L.J. 1508, 1516-20 (1992).

unreasonable intrusion. As the Supreme Court once stated, "surveillance of private property by using highly sophisticated surveillance equipment not generally available to the public . . . might be constitutionally proscribed absent a warrant." Dow Chemical, 476 U.S. at 238.

Dow Chemical provides useful guidance for search and seizure cases involving surveillance technology. There, the Environmental Protection Agency, without a warrant, had flown over Dow's industrial plant with a precise mapping camera. Dow argued that the use of the camera was an unconstitutional search. The Supreme Court disagreed, reasoning that the government is not foreclosed from using technology to enhance its surveillances, provided that that technology does not reveal "intimate details." Id. at 238. The Court was satisfied that the camera did not reveal such "details" because it was not "some unique sensory device that, for example, could penetrate the walls of buildings and record conversations in Dow's plants, offices, or laboratories, but rather a conventional, albeit precise, commercial camera commonly used in mapmaking." Id. at 238. Similarly, in United States v. Knotts, 460 U.S. 276 (1983), the police surveilled the defendant by means of an electronic beeper attached to the interior of a five-gallon chloroform drum. Relying on the beeper's signals, the police eventually uncovered the drum just outside the residence of one of the defendants. The defendant who owned the residence insisted that the warrantless use of the beeper was unconstitutional because it violated the sanctity of his home. The Supreme Court, however,

12

held that the surveillance was not an unreasonable search because "there is no indication that the beeper was used in any way to reveal information as to the movement of the drum within the cabin." Id. at 285; see also Place, 462 U.S. at 706-07 (specially trained canine sniffing luggage is not an unconstitutional search because it is a "limited disclosure" and involves no "embarrassment and inconvenience"); Smith, 442 U.S. at 741-46 (pen register, which discloses only the telephone numbers that have been dialed and not the content of communications, is not an unconstitutional search); United States v. Lee, 274 U.S. 559, 563 (1927) (searchlight that uncovered contraband from a distance was not an unconstitutional search). Thus, the mere fact that the police have employed relatively sophisticated forms of technological surveillance does not render the surveillance unconstitutional.[5] While technology certainly gives law enforcement a leg up on crime, the Supreme Court has "never equated police efficiency with unconstitutionality." Knotts, 460 U.S. at 284. The crucial inquiry, as in any search and seizure analysis, is whether the technology reveals "intimate details." Dow Chemical, 476 U.S. at 238.

A thermal imager, according to the government, is no more intrusive than the other animate and inanimate means of

---

[5]"Nothing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case." Knotts, 460 U.S. at 282. "The Supreme Court has repeatedly held that the fact that a surveillance device allowed for super- or extra-sensory perception is not fatal to a Katz analysis." Ford, 34 F.3d at 997.

surveillance that the Supreme Court has concluded does not offend the Fourth Amendment. That is, like the trained canine in Place or the precise mapping camera in Dow Chemical, a thermal imager is an acceptable surveillance technique because it does not reveal intimate details within the structure being scanned. Instead, the government argues, the device assesses only heat differentials in objects and therefore poses no threat to the privacy concerns that the Fourth Amendment is intended to protect. The Ishmaels contend, however, that a thermal imager is the functional equivalent of an X-ray machine in that it allows officers to "see" within a structure what it otherwise cannot see with the naked eye. Specifically, they argue, a thermal imager measures heat that is generated within a structure and, to that extent, constitutes an unreasonable intrusion on one's Fourth Amendment privacy. The Ishmaels, echoing the district court below, see Ishmael, 843 F. Supp. at 212, argue that a thermal imager is the type of "sophisticated technology" that the Court in Dow Chemical warned law enforcement officials not to use without a warrant.

The Ishmaels overstate the device's capabilities. The device "does not intrude in any way into the privacy and sanctity of a home." Myers, ___ F.3d at ___. It "is a passive, non-intrusive instrument" in that "[i]t does not send any beams or rays into the area on which it is fixed or in any way penetrate structures within that area." Penny-Feeney, 773 F. Supp. at 223. As the Eighth Circuit recently noted, "[t]he detection of the heat waste [is] not an intrusion into the home; no intimate details of the home [are]

14

observed, and there [is] no intrusion upon the privacy of the individuals within." Pinson, 24 F.3d at 1059.[6] The device, in other words, poses no greater intrusion on one's privacy than a precise mapping camera, an electronic beeper, or a pen register.

The manner in which a thermal imager was used in this case is equally significant in assessing the reasonableness of the intrusion. When the DEA performed its pre-dawn thermal readings in this case, the officers never physically invaded the Ishmael's residential or commercial curtilage. See Dow Chemical, 476 U.S. at 237 ("[a]ny actual physical entry by EPA into any enclosed area would raise significantly different questions"). The district court below characterized the steel building as a "business," see Ishmael, 843 F. Supp. at 210, and recognizing that we can review the court's factual finding only for clear error, we will not disturb the court's finding.[7] But the court erred as a matter of law when it stated the following: "to say that the government could

---

[6]The Ishmaels also overstate its accessibility, which also is a significant consideration. See Dow Chemical, 476 U.S. at 238. As the district court in Deaner stated:

> The technology employed is "off the shelf," having been in general use for fifteen years. The device is utilized by many businesses for a variety of purposes, including the detection of roof leaks, steam pipe leaks, cracks in high voltage transmission lines and overloaded transformers. Several companies market the product, which is readily available through purchase, rental or the services of a thermographer.

Deaner, 1992 WL 209966, at *2.

[7]We would reach the same conclusion even if we could apply a more exacting standard of review. Applying the four factors from United States v. Dunn, 480 U.S. 294, 300-03 (1987), the steel building clearly is beyond the Ishmaels' residential curtilage. The building, for example, stood 200 to 300 yards from the Ishmaels' mobile home and was not enclosed within a fence that also surrounded the home. See Ishmael, 843 F. Supp. at 209-10.

15

intrude up to the very windows of the building on the basis of the `open fields' doctrine simply because it was outside the curtilage of a home, would eviscerate the Fourth Amendment." Id. The Supreme Court, in fact, has held precisely the opposite. In United States v. Pace, 955 F.2d 270 (5th Cir. 1992), law enforcement officers came abreast of the defendant's barn, which stood beyond the residential curtilage, and peered inside the barn to observe the defendant's drug operation. The defendant argued that the barn qualified as a business and that the barn's surrounding area was protected under a theory analogous to the home curtilage theory. Noting that the Supreme Court effectively rejected this theory in United States v. Dunn, 480 U.S. 294, 303-05 (1987), we concluded that "there is no business curtilage surrounding a barn lying within an open field." Pace, 955 F.2d at 276.[8] The officers therefore were entitled to "come as close to the structure as necessary to look inside without physically entering." Id.

Similarly, the officers in this case were entitled to observe the steel building either by air or on foot because the building,

---

[8]In Dunn, which involved facts nearly identical to those in Pace, the Supreme Court accepted for the sake of argument that the defendant's barn was a business. Dunn, 480 U.S. at 303. The Court then stated:

> the officers never entered the barn, nor did they enter any other structure on respondent's premises. Once at their vantage point, they merely stood, outside the curtilage of the house and in the open fields upon which the barn was constructed, and peered into the barn's open front. And, standing as they were in the open fields, the Constitution did not forbid them to observe the phenylacetone laboratory located in respondent's barn. This conclusion flows naturally from our previous decisions.

Id. at 304.

like the barn in Pace, stood in an open field. And, as we have already discussed, the fact that the officers enhanced their observations with a thermal imager does not require a different conclusion. The device, when used in an "open field," does not offend the Fourth Amendment because it is passive and non-intrusive. The sanctity of one's home or business is undisturbed. We therefore conclude that the DEA's warrantless use of a thermal imager in this case was not an unconstitutional search.

III.

Having concluded that the warrantless use of a thermal imager was not unconstitutional in this case, we now turn to the question of whether the device's readings, in conjunction with the remainder of the evidence the DEA proferred to the magistrate judge, established the necessary probable cause to issue the warrant. In determining whether probable cause exists, "a magistrate judge must make a practical, common-sense decision as to whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Byrd, 31 F.3d 1329, 1340 (5th Cir. 1994). Reviewing courts (including district courts) should afford a magistrate judge's decision "great deference." Illinois v. Gates, 462 U.S. 213, 236 (1983); United States v. McCarty, 36 F.3d 1349, 1356 (5th Cir. 1994); United States v. Robertson, 39 F.3d 891, 892 (8th Cir. 1994).

The totality of the circumstances in this case clearly indicates a fair probability that the Ishmaels were cultivating

17

marijuana in the steel building's substructure. Rohn Ishmael, for example, was extremely careful not to reveal the need for the concrete re-mix. The substructure had been elaborately constructed with its own electricity supply and was being fed water from the nearby pond. The substructure's exhaust fan operated on a continuous basis. In addition, the Ishmaels phone records indicated that their phone had been used to call various horticulture shops, two of which appeared on a law enforcement computer data base. The Ishmaels' electric utility records demonstrated that the substructure was consuming an inordinate amount of power, particularly when compared to the mobile home's power usage. Finally, and perhaps most importantly, expert thermographers analyzed the two readings from the thermal imager and concluded that the inordinate amount of heat emanating from the substructure was consistent with indoor cultivation of marijuana. Construing this evidence in a "common-sense manner,"[9] we conclude that probable cause existed for the issuance of the warrant. See Robertson, 39 F.3d at 893-94 (readings from a thermal imager, when combined with informant's tip and police officer's own observations, establish probable cause).

IV.

_____

[9] "Like the district court, . . . we construe the [government's] affidavit in a common-sense manner." McCarty, 36 F.3d at 1356.

For the reasons stated above, the district court's order granting the Ishmaels' motion to suppress is REVERSED and the case is REMANDED to the district court for further proceedings.