**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Danny Lee KYLLO, Defendant–Appellant.**

No. 96–30333.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1997.

Decided April 7, 1998.

---

1. We deny McNutt's request for attorney's fees.

Kenneth Lerner, Portland, Oregon, for defendant-appellant.

Kristine Olson, United States Attorney, District of Oregon; Robert R. Thomson, Assistant United States Attorney, Medford, Oregon, for plaintiff-appellee.

David K. Allen, American Civil Liberties Union of Oregon, Inc., Portland, Oregon, for amicus.

Before: NOONAN and HAWKINS, Circuit Judges, and MERHIGE, * District Judge.

Opinion by Judge MERHIGE; Dissent by Judge HAWKINS.

MERHIGE, District Judge:

Based on the readings from a thermal imager, the observation of unusually high power usage at Defendant–Appellant Danny Lee Kyllo's home, information provided by an informant, and other circumstantial evidence, federal law enforcement officers obtained a warrant to search the premises of Danny Lee Kyllo ("Kyllo"). The officers executed the warrant and discovered an indoor marijuana growing operation, weapons, and drug paraphernalia. After being indicted, Kyllo moved to suppress all the evidence obtained in the search of his residence. The district court denied his motion. We vacated that conviction and remanded for further proceedings. On remand, the district court again denied Kyllo's motion to suppress. This appeal presents an issue of first impression in this circuit, namely whether thermal imaging scanning is a search within the meaning of the Fourth Amendment. We hold that thermal imaging scanning is a search within the meaning of the Fourth Amendment.

## I. Factual Background

While investigating a suspected marijuana growing and distribution operation, United States Bureau of Land Management Agent William Elliott ("Elliott") discovered information suggesting Kyllo's involvement. Elliott contacted Oregon state law enforcement officers who provided him with additional

* Honorable Robert R. Merhige, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

information, including the following: that Kyllo lived with his wife, Luanne Kyllo ("Luanne"), in one unit of a triplex in Florence, Oregon; that the triplex was occupied by other persons who were suspects in the investigation; that a car registered to Kyllo and Luanne at the triplex address was parked outside the triplex; that Kyllo had allegedly told a police informant that Luanne and he could supply the informant with marijuana; and that the previous month, Luanne had been arrested for delivery and possession of a controlled substance.

Elliott subpoenaed Kyllo's utility records. Using a chart for estimating average electricity use, Elliott concluded that Kyllo's electricity use was abnormally high. At Elliott's request, Staff Sergeant Daniel Haas ("Haas") of the Oregon National Guard examined Kyllo's home using an Agema Thermovision 210 thermal imaging device (the "Agema"). A thermal imager operates by observing and recording the differential heat patterns emanating from various objects within its view. The results of the measure of these differential heat patterns are then displayed on a viewfinder on top of the instrument which indicates the amount of heat emitted by objects by shading the area around the object a lighter or darker color. As the Tenth Circuit explained,

> [a]ctivities that generate a significant amount of heat ... produce a heat "signature" that the imager can detect. Under optimal conditions—viewing through an open window into a darkened room, for example—the imager (or one much like it) might well be able to resolve these heat signatures into somewhat indistinct images. The utility of the machine depends therefore not on the inevitable and ubiquitous phenomenon of heat loss but on the presence of distinguishable heat signatures inside the structure.

*United States v. Cusumano,* 67 F.3d 1497, 1501 (10th Cir.1995), *vacated on other grounds,* 83 F.3d 1247 (10th Cir.1996).

Haas' search revealed what he considered abnormally high levels of heat emanating from Kyllo's home. Elliott concluded that this heat signature indicated the presence of high intensity lights used to grow marijuana indoors. Elliott presented the information he had gathered about Kyllo in an affidavit (the "Affidavit") to a federal magistrate judge for the United States District Court for the District of Oregon and requested a search warrant for Kyllo's home. The magistrate issued the warrant. Elliott searched Kyllo's home. He discovered an indoor marijuana growing operation and seized a number of items, including marijuana, weapons, and drug paraphernalia.

Kyllo was indicted on one count of the manufacture of marijuana in violation of 21 U.S.C. § 841(a)(1). After holding a suppression hearing, the district court denied Kyllo's motion. Kyllo pled guilty and was sentenced to 63 months in custody. Kyllo appealed the district court's denial of his motion to suppress the evidence to this Court. In a memorandum disposition, this Court found that, while the portion of the Affidavit relating to Kyllo's electricity use was false and misleading, the district court was not clearly erroneous in concluding that the false statements were not knowingly or recklessly made. *See United States v. Kyllo,* 37 F.3d 526 (9th Cir.1994). Thus, the portion of Elliott's affidavit relating to Kyllo's electricity use was properly considered by the magistrate judge in determining whether there was probable cause to issue a warrant.

This Court then remanded the case to the district court to hold an evidentiary hearing on the capabilities of the Agema and on whether Elliott knowingly or recklessly omitted from the Affidavit the fact that Kyllo and Luanne were divorced. "A district court must suppress evidence seized under a warrant when an affiant has knowingly or recklessly included false information in the affidavit." *United States v. Dozier,* 844 F.2d 701, 705 (9th Cir.), *cert. denied,* 488 U.S. 927, 109 S.Ct. 312, 102 L.Ed.2d 331 (1988). The district court found that, while Elliott's omission from the Affidavit of the fact that Kyllo and Luanne were divorced was misleading, it was not knowingly false or made in reckless disregard for the truth. *See United States v. Kyllo,* No. Cr. 92–51–FR, 1996 WL 125594 (D.Or. Mar. 15, 1996). We review the district court's finding that these statements were not made with reckless regard for the truth under the clearly erroneous standard. *See Dozier,* 844 F.2d at 705.

In light of the evidence presented at the suppression hearing, it was not clearly erroneous for the district court to find that Elliott's omission from the Affidavit of the fact that Kyllo and Luanne were divorced was not knowingly false or made in reckless disregard for the truth. No evidence was presented at the hearing that either Elliott or the Oregon State law enforcement officers who supplied him information knew that Kyllo and Luanne were divorced. Furthermore, there was no evidence presented showing that their failure to discover and report the fact of Kyllo's divorce was reckless. Thus, the portion of Elliott's affidavit relating to Kyllo's relationship to Luanne was properly considered by the magistrate judge in determining whether there was probable cause to issue a warrant.

After holding the evidentiary hearing, the district court found that Elliott did not knowingly or recklessly omit information about Kyllo's divorce from the Affidavit. Regarding the Agema, the district court found that (1) it revealed no intimate details of Kyllo's home, (2) it did not intrude on the privacy of persons inside Kyllo's home, (3) it could not penetrate walls or windows or reveal human activities or conversations, and (4) it "recorded only the heat being emitted from the home." *United States v. Kyllo*, No. CR 92–51–FR (D.Or. Mar. 15, 1996). Based on its factual findings, the district court concluded that the warrantless search of Kyllo's home with the Agema was permissible and that there was probable cause to issue the warrant to search Kyllo's home.

On appeal, Kyllo argues that the use of the thermal imaging scanner to measure the heat emanating from his house was a search within the meaning of the Fourth Amendment and, therefore, required a warrant to be valid. As a result, Kyllo argues that the search was unconstitutional, rendering the search warrant based on the results of Agema's measurements invalid. Kyllo further argues that the district court erred in finding that Elliott's omission from the Affidavit of the fact that Kyllo and Luanne were divorced was not knowingly false or made in reckless disregard for the truth. Kyllo contends that neither the findings from the warrantless search with the Agema nor Elliott's omissions from the Affidavit should have been considered by the magistrate in determining whether there was probable cause to issue the search warrant. Thus, Kyllo argues, the evidence obtained during the search should be suppressed.

## II. Warrantless Search with Thermal Imaging Device

Kyllo first argues that the warrantless use of a thermal imaging device to scan his home constituted a "search" within the meaning of the Fourth Amendment, and that the fruits of this warrantless search must therefore be suppressed. The validity of a warrantless search is reviewed *de novo*. See *United States v. Van Poyck*, 77 F.3d 285, 290 (9th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 276, 136 L.Ed.2d 199 (1996). The district court's findings of fact on the capabilities of the Agema are reviewed for clear error. See *Ornelas v. United States*, 517 U.S. 690, 698–700, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996); *United States v. Hernandez*, 27 F.3d 1403, 1406 (9th Cir.1994).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and other effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. We must apply the two-prong test enunciated by the Supreme Court in *Katz* to determine whether a warrantless search violated a defendant's legitimate expectation of privacy: the defendant must have a subjective expectation of privacy, and that expectation must be one that society is prepared to acknowledge as reasonable. See *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (Harlan, J., concurring); *see also California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811–12, 90 L.Ed.2d 210 (1986). We conclude that Kyllo had a subjective expectation of privacy that activities conducted within his home would be private. Although the Supreme Court ultimately held that the search conducted in *Ciraolo* was constitutional, it first concluded that the defendant, who enclosed his backyard marijuana crop with a double fence, "ha[d] met the test of manifesting his own subjective intent and desire to maintain privacy as to his unlawful agricultural pursuits."

*Ciraolo,* 476 U.S. at 211, 106 S.Ct. at 1811–12. Surely a defendant, such as Kyllo, who moves his agricultural pursuits inside his house has similarly manifested a subjective expectation of privacy in those activities. *See United States v. Ishmael,* 48 F.3d 850, 854 (5th Cir.1995).

In cases involving the use of thermal imagers, other circuits have framed the inquiry in the first prong of *Katz* differently. Those circuits have analogized the excess heat measured by a thermal imager to the excess trash left on the curb, and have asked whether the defendant has manifested a subjective expectation of privacy in the "waste heat" emanating from their homes. Those courts have held, citing *California v. Greenwood,* 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), that such defendants have failed to manifest a subjective expectation of privacy in the excess heat. *See United States v. Robinson,* 62 F.3d 1325, 1328–29 (11th Cir. 1995); *United States v. Myers,* 46 F.3d 668, 669–70 (7th Cir.1995); *United States v. Pinson,* 24 F.3d 1056, 1058 (8th Cir.1994). We respectfully reject the "heat waste" analogy. The purpose and utility of the thermal imager is to reveal the heat signatures of various objects and activities occurring inside a structure. "The pertinent inquiry is not, therefore, whether the Defendants retain an expectation of privacy in the 'waste heat' radiated from their home but, rather, whether they possess an expectation of privacy in the heat signatures of the activities, intimate or otherwise, that they pursue within their home." *United States v. Cusumano,* 67 F.3d 1497, 1502 (10th Cir.1995), *vacated on other grounds,* 83 F.3d 1247 (10th Cir.1996); *see also Katz,* 389 U.S. at 353, 88 S.Ct. at 512 (holding the defendant had exhibited a subjective expectation of privacy although he had not taken every precaution against electronic eavesdropping); *Ishmael* 48 F.3d at 854–55 (holding warrantless search with thermal imager constitutional but rejecting the "waste heat" analogy).

 We now must address whether Kyllo's subjective expectation of privacy regarding the heat signatures of the activities within his home is one that society is prepared to acknowledge as reasonable. As the Supreme Court has stated, "[a]t the risk of belaboring the obvious, ... [the individual's expectation in the privacy of a residence] is plainly one that society is prepared to recognize as reasonable." *United States v. Karo,* 468 U.S. 705, 714, 104 S.Ct. 3296, 3303, 82 L.Ed.2d 530 (1984). The Supreme Court has repeatedly emphasized that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961). Because of the respect for the sanctity of the home, "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980). Therefore, warrantless searches and seizures in the home are "presumptively unreasonable." *Id.*

Other circuits that have considered the warrantless use of thermal imagers have held that because of the technical inadequacies of the thermal imager used in their respective cases, the scan of defendants' homes did not reveal enough intimate details to raise constitutional concerns, all citing *Dow Chemical v. United States,* 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986). *See Robinson,* 62 F.3d at 1328 (11th Cir.1995); *Ishmael,* 48 F.3d at 854 (5th Cir.1995); *Myers,* 46 F.3d at 669–70 (7th Cir.1995); *Pinson,* 24 F.3d at 1059 (8th Cir.1994); *contra Cusumano,* 67 F.3d at 1504 (10th Cir.1995). We too are concerned about the nature of the information that the thermal imager used to scan Kyllo's home is able to reveal. As we stated on remand,

> [the *Katz*] inquiry cannot be conducted in the abstract. We must have some gauge of the intrusiveness of the thermal imaging device, which depends on the quality and the degree of detail of information that it can glean. For example, our analysis will be affected by whether, on the one extreme, this device can detect sexual activity in the bedroom, as Kyllo's expert suggests, or, at the other extreme, whether it can only detect hot spots where heat is escaping from a structure.

*United States v. Kyllo,* 37 F.3d 526, 530–31 (9th Cir.1994).

In the evidentiary hearing conducted on remand, Kyllo presented considerable evidence to the district court about the capabilities of near-end thermal imagers such as the Agema Thermovision 210. Carlos Ghigliotty presented a videotape he had created for the district court which clearly demonstrated the ability of the Agema and other near short wave infrared cameras to see through glass. Mr. Ghigliotty is president of Infrared Technologies, a company that does testing of the limitations and capabilities of infrared cameras and tests ways infrared cameras can be applied in the field, and has been involved in thermal imaging and infrared technology for fourteen years. The videotape demonstrated that an Agema camera used in the dark to scan a car with tinted, closed windows clearly showed a person waving inside the car. The videotape also depicted the image displayed on the Agema which revealed a man standing inside a glass door of a house, and showed details such as his movements to open the door, and his hand waving. Mr. Ghigliotty testified that this was a common capability among near-end thermal imagers such as the Agema.

Bill Martin, the director of sales for Flir Systems Incorporated which manufactures infrared imaging equipment, testified for the government. Mr. Martin had previously worked for the Agema company, and the company had provided Mr. Martin extensive training in infrared technology, including specific training on the Agema Thermovision 210. (T–2, 24). Mr. Martin admitted that if a window was open and it was dark in the room, any thermal imager could detect activity through the opening. (T–2, 100). He furthermore stated that the imager could "see" people behind curtains if they were very close to the window, and could reveal people embracing if the window was open and it was dark out. Mr. Martin also testified that thermal imagers have physiology applications, as they can detect subsurface problems in the human body.

The record also contains a brochure published by the Agema company describing the capabilities of an Agema Thermovision 210: "Sensitive to temperature differences as small as 0.9 F, the Thermovision 210 can detect and delineate objects or persons in complete darkness, or under natural cover, as far away as 1500 feet. Operations can be conducted in any level of ambient light and at air temperatures from 14 to 131 F. Even at that distance ... the rugged 210 can easily distinguish between a domestic animal and a human being."

We conclude that the details unveiled by a thermal imager are sufficiently "intimate" to give rise to a Fourth Amendment violation. Although the Tenth Circuit's opinion in *Cusumano* was later vacated on rehearing en banc on other grounds, we agree with its initial conclusion that

> [o]ur fellow circuits have, we think, misapprehended the most pernicious of the device's capabilities. The machine intrudes upon the privacy of the home not because it records white spots on a dark background but rather because the interpretation of that data allows the government to monitor those domestic activities that generate a significant amount of heat. Thus, while the imager cannot reproduce images or sounds, it nonetheless strips the sanctuary of the home of one vital dimension of its security: 'the right to be let alone' from the arbitrary and discretionary monitoring of our actions by government officials.

*United States v. Cusumano,* 67 F.3d 1497, 1504 (10th Cir.1995), *vacated on other grounds,* 83 F.3d 1247 (10th Cir.1996). It is not disputed whether the Agema 210 could reveal details such as intimate activities in a bedroom. According to the manufacturer, the imager used in this case is sensitive to temperature differences as small as 0.9 F. As the court noted in *Cusumano,* it would not be difficult to determine the origin of two commingled objects emitting heat in a bedroom at night. *Id.* at 1504. Even assuming that the Agema, apparently a relatively unsophisticated thermal imager, is unable to reveal such intimate details, technology improves at a rapid pace, and much more powerful and sophisticated thermal imagers are being developed which are increasingly able to reveal the intimacies that we have heretofore trusted take place in private absent a valid search warrant legitimizing their observation.

■ Furthermore, even if a thermal imager does not reveal details such as sexual

activity in a bedroom, with a basic understanding of the layout of a home, a thermal imager could identify a variety of daily activities conducted in homes across America: use of showers and bathtubs, ovens, washers and dryers, and any other household appliance that emits heat. *See United States v. Field,* 855 F.Supp. 1518, 1519 (W.D.Wis.1994) (stating that a thermal imager had detected the presence of a dehumidifier in use in a closet). Even the routine and trivial activities conducted in our homes are sufficiently "intimate" as to give rise to Fourth Amendment violation if observed by law enforcement without a warrant. *Compare Arizona v. Hicks,* 480 U.S. 321, 325, 107 S.Ct. 1149, 1152–53, 94 L.Ed.2d 347 (1987) ("It matters not that the search uncovered nothing of any great personal value to respondent.... A search is a search, even if it happens to disclose nothing but the bottom of a turntable.") and *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (holding that revelation of a single detail about the interior of the home, whether or not the beeper placed in can of ether was still inside the home, was sufficient to violate the Fourth Amendment) with *Florida v. Riley,* 488 U.S. 445, 452, 109 S.Ct. 693, 697, 102 L.Ed.2d 835 (1989) (plurality decision) (visual surveillance of interior of greenhouse revealed "no intimate details connected with the use of the home") (dicta) and *Dow Chemical,* 476 U.S. at 237–39, 106 S.Ct. at 1826–27 (surveillance by camera revealing outlines of commercial buildings did not disclose intimate details of the home). We therefore conclude that the use of a thermal imager to observe heat emitted from various objects within the home infringes upon an expectation of privacy that society clearly deems reasonable.

Because scanning with a thermal imager without a warrant violates the Fourth Amendment, the Agema readings should not have been considered by the magistrate judge. However, the district court did not consider whether the information provided to the magistrate was sufficient to sustain a search warrant without the addition of the readings from the thermal imager. Therefore, we remand for the district court to make that determination. On remand, the district court should be cognizant of the Court's holdings that the portions of Elliott's affidavit relating to Kyllo's electricity use and his relationship to Luanne were properly considered by the magistrate judge in determining whether there was probable cause to issue a warrant.

**REVERSED and REMANDED.**

HAWKINS, Circuit Judge, dissenting:

My colleagues have made the best case imaginable for the proposition that the use of a thermal imaging device constitutes a search within the meaning of the Fourth Amendment. I am not persuaded.

A search, whether of a home, a car, or a body, is, at bottom, an intrusion; a nonconsensual invasion of protected space. Whatever its Star Wars capabilities, the thermal imaging device employed here intruded into nothing. Rather, it measured the heat emanating from and on the outside of a house. Nor did law enforcement randomly choose its choice of targets: the agents employing the device were alerted to Kyllo's house because of its extraordinary use of electricity, a use consistent with indoor marijuana cultivation.

I would follow the lead of our sister circuits and hold that the use of thermal imaging technology does not constitute a search under contemporary Fourth Amendment standards.