**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Christopher Paul CUSUMANO, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Robert William PORCO, Defendant–Appellant.**

**Nos. 94–8056, 94–8057.**

United States Court of Appeals, Tenth Circuit.

Oct. 4, 1995.

Rehearing Denied (Defendant's petition) Dec. 5, 1995.

Rehearing Granted (United States' petition) Dec. 5, 1995.

---

Daniel G. Blythe of Rogers, Blythe & Lewis, Cheyenne, Wyoming, for Defendant–Appellant Cusumano.

Donald Horowitz, Hackensack, New Jersey (James W. Gusea of Gusea, Pattno & White, Cheyenne, Wyoming, with him on the brief), for Defendant–Appellant Porco.

William U. Hill, Assistant United States Attorney (David D. Freudenthal, United States Attorney, with him on the briefs), District of Wyoming, Cheyenne, Wyoming, for Plaintiff–Appellee.

Before HENRY and McKAY, Circuit Judges, and KANE,* Senior District Judge.

McKAY, Circuit Judge.

Mr. Robert Porco and Mr. Christopher Cusumano appeal their convictions for the manufacture of marijuana in violation of 21 U.S.C. § 841(a)(1). There is no doubt that Messrs. Porco and Cusumano in fact performed the acts alleged in the indictment: they do not deny that the police, searching pursuant to a duly authorized warrant, discovered a sophisticated indoor marijuana cultivation operation in the basement of their home. Their misdeeds notwithstanding, the Defendants contend that this warrant was supported by data and opinions drawn from the results of a warrantless thermal scan of their home. The Defendants argue that the warrantless use of a thermal imager upon their home violated the Fourth Amendment of the Constitution; that, in the absence of the unconstitutionally obtained thermal data, probable cause to support the warrant was lacking; and that the evidence discovered during the search of their home should therefore be suppressed. The district court was not swayed by the Defendants' reasoning and denied the motion to suppress. The Defendants then entered a conditional plea of guilty that reserved their right to appeal the district court's decision on the motion to suppress. This appeal followed.

The parties do not dispute that the government, without seeking or obtaining a warrant, used a thermal imager to monitor the exterior of the Defendants' home and attached garage.[1] The imager revealed a large "hot spot" along one wall of the home's attached garage; the windows set into this wall were blocked from visual observation by a large camper shell leaning against the wall of the garage. The imager also identified an unusual number of "hot spots" along the roof and near the front door of the home. The district court found, and the government concedes, that the number and location of these "hot spots" strengthened the government's already existing suspicion that the Defendants were cultivating marijuana in their home.

Our analysis begins with the text of the Amendment: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. The necessary interstices of the sweeping protection explicit in the constitutional text have been filled in by judicial interpretation. Modern Fourth Amendment jurisprudence begins, of course, with *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Abandoning earlier formulations of the Fourth Amendment, which had defined the ambit of Fourth Amendment protection by reference to the law of trespass, *see, e.g., Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928); *Goldman v. United States*, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), *Katz* erected an analytic framework grounded in an individual's "reasonable expectations of privacy." *Katz*, 389 U.S. at 352, 359, 361, 88 S.Ct. at 511–12, 515–16, 516–17. The *Katz* inquiry has most commonly been stated in the terms employed by Justice Harlan in his *Katz* concurrence: has government action intruded upon interests in which an individual maintains a subjective expectation of privacy; if so, is that expectation one that society deems reasonable? *See* 389 U.S. at 360–62, 88 S.Ct. at 516–17 (Harlan, J., concurring). The Defendants seek to shroud their actions in the security expressly afforded the home by the constitutional text—a security that has been traditionally deemed both objectively and subjectively reasonable. The government, for its part, denies that the imager intrudes upon domestic privacy at all. It

---

* Honorable John L. Kane, Jr., Senior United States District Judge for the District of Colorado, sitting by designation.

1. A thermal imager detects and records infrared radiation emitted by the heat sources within its field of view. The imager identifies temperature differentials. The device is calibrated to the ambient background temperature; warmer objects then appear as white images against the dark (and cooler) background. The imager used in this case can distinguish objects whose temperatures differ by as little as .5 degree Celsius; however, its ability to resolve these temperature differentials into distinct images is more limited. Heat sources obscured by solid walls, for example, give rise to "hot spots" upon the surrounding walls. Identification of the activities that generate such hot spots is then a function of the operator's expertise and a general knowledge of the layout of the structure.

claims that the device merely records the emanation of "waste heat" from the exterior of a building; that no reasonable expectation of privacy, either objective or subjective, exists in this "waste heat"; that the technical imprecision of the device is such as to leave private that which transpires inside a home; and that the Constitution does not forbid the government from employing modern technology to glean incriminating data even from the most subtle of telltale signs.

This circuit has yet to address the constitutionality of the warrantless use of the thermal imager. Other courts that have analyzed this question have split. The Seventh and Eighth Circuits recently embraced the analysis set forth in *United States v. Penny–Feeney*, 773 F.Supp. 220 (D.Hawaii 1991), *aff'd on other grounds*, 984 F.2d 1053 (9th Cir.1993), holding that the use of an imager is not a search within the meaning of the Fourth Amendment. *See United States v. Myers*, 46 F.3d 668 (7th Cir.1995); *United States v. Pinson*, 24 F.3d 1056 (8th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 664, 130 L.Ed.2d 598 (1994). The Eleventh Circuit, in *United States v. Ford*, 34 F.3d 992 (11th Cir.1994), reached the same conclusion, albeit for slightly different reasons. The Fifth Circuit has rejected aspects of the *Penny–Feeney* and *Ford* frameworks, but, drawing upon the "open fields" doctrine, nonetheless has held that a thermal scan of a building outside the curtilage does not qualify as a Fourth Amendment search. *See United States v. Ishmael*, 48 F.3d 850 (5th Cir.1995). The Supreme Court of Washington, interpreting both the Fourth Amendment and the relevant sections of the Washington Constitution, has determined that the warrantless use of a thermal imager runs afoul of both constitutions. *State v. Young*, 123 Wash.2d 173, 867 P.2d 593 (1994).

A thermal imager operates by observing and recording the differential heat patterns radiating through the surface of a structure. Focusing upon this most basic aspect of the imager's operation, our fellow circuits have reduced the Fourth Amendment inquiry to an analysis of the reasonable expectations of privacy residing in this "waste heat." *See*

*Ishmael*, 48 F.3d at 853–57; *Ford*, 34 F.3d at 995–97; *Pinson*, 24 F.3d at 1058–59; *Penny–Feeney*, 773 F.Supp. at 225–28. A number of justifications have been put forth to support the conclusion that no expectation of privacy, either objective or subjective, exists in "waste heat." The observation of "waste heat" has been analogized to the garbage search approved in *California v. Greenwood*, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988); to the dog sniff found constitutional in *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); to the pen register condoned by *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); and to the overhead surveillance flights upheld in *California v. Ciraolo*, 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), *Dow Chem. Co. v. United States*, 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986), and *Florida v. Riley*, 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989). It has been noted that the thermal imager is a passive device, employed from beyond the curtilage, which emits no rays or beams and which does not intrude in any fashion upon the observed property; that the resolution of the device is limited and that, in general, it detects only hot spots on the exterior surfaces of a building; that in many cases the machine measures heat which has been actively vented from a structure by a defendant; and that the machine only observes a phenomenon that could be watched by any member of the public equipped with a similar instrument (which is commercially available).

■■■ We concede that the analogies called upon by our fellow circuits are somewhat persuasive, if not altogether compelling.[2] We believe, however, that our fellow circuits have misframed the relevant Fourth Amendment inquiry and, in so doing, have asked, and answered, the wrong question. There is no question but that activities which take place within the sanctity of the home merit the most exacting Fourth Amendment protection. It is likewise undisputed that the illegal conduct which produced the heat detected by the thermal imager was performed within the four walls of the Defendants' home.[3] It must, finally, be acknowledged

---

2. We address the specific arguments relied upon by our fellow circuits in greater detail below.

3. The government does not contend that the illegal activities were themselves in plain view.

that the heat gradients measured by the imager radiated beyond the confines of the home. Is the link between the "waste heat" observed by the imager and the activities that gave rise to that heat so attenuated as to restrict the "expectation of privacy" analysis to the heat alone? We think not.

To focus upon the "waste heat" radiating from a structure is to ignore both the purpose of the device and the manner in which it operates. The imager measures not "waste heat" but rather heat differentials; it records heat gradients across the exterior surface of a building. The laws of thermodynamics inform us that the amount of heat radiated from a given section of the exterior wall is directly related to the amount of heat generated by heat sources in proximity to the interior of that wall. Activities that generate a significant amount of heat therefore produce a heat "signature" that the imager can detect.[4] Under optimal conditions—viewing through an open window into a darkened room, for example—the imager (or one much like it) might well be able to resolve these heat signatures into somewhat indistinct images.[5] *See, e.g., Young,* 867 P.2d at 595 (noting that an imager can discern a human form through a curtained window under certain circumstances). More typically, the machine identifies only hot spots on a wall (as was true in this case). In either instance, it is the existence of these distinct interior sources that the device indirectly recognizes—with greater or lesser imprecision varying with the insulating attributes of the exterior walls—and records. While the heat lost by a building is data of some limited value,[6] the true worth of the device—the very reason that the government turned the imag-

er on the home of the Defendants—is predicated upon the translation of these thermal records into intelligible (albeit speculative) information about the activities that generate the observed heat. The utility of the machine depends therefore not on the inevitable and ubiquitous phenomenon of heat loss but on the presence of distinguishable heat signatures inside the structure. We see no reason to blind ourselves to the physical reality of this relationship by severing our analysis of the heat differentials emanating through the walls of a structure from an informed consideration of the heat sources *within* that structure.

Our characterization of the issue follows naturally from the facts of *Katz.* It must be remembered that the bug at issue in *Katz* was fixed to the outside of a public phone booth. Reduced to its operational fundamentals, that bug did not monitor the interior of the phone booth at all; rather, it measured the molecular vibrations of the glass that encompassed that interior. Alternatively, it might fairly be said that the bug passively recorded the propagation of waste vibrational energy into the public sphere. Drawing upon the logic embraced by our fellow circuits, one could reason that the translation of the vibrational record into an account of that which transpired within the phone booth was simply a useful interpretation of abandoned energy—an analysis which would, we note, approve the search condemned by *Katz.* The Supreme Court in *Katz* did not dwell upon these physical minutiae, but, rather, recognized that the Fourth Amendment broadly protects from government intrusion that which a person reasonably seeks to keep private. *See Katz,* 389 U.S. at 351–52, 88 S.Ct. at 511–12; *id.* at 361, 88 S.Ct. at 516–17 (Harlan, J., concurring). The Court es-

---

4. Typical structures tend to radiate heat from exterior surfaces at a more or less uniform rate that varies with the average internal temperature of a building. Activities that generate enough heat to raise the temperature of an interior wall above that average cause the corresponding section of the exterior to radiate a somewhat greater amount of heat. The imager records this differential heat loss as a white "hot spot" on the exterior of the structure.

5. The infrared targeting devices employed by the military are apparently now sophisticated enough to perform this feat. It seems only a matter of time before such capabilities trickle down to law enforcement.

6. The heat lost by a building is indicative of the amount of energy expended by the occupants of that building. We note that the vast majority of individuals who labor under high electric bills are engaged in deeds that are legal, harmless, and deserving of privacy. Without invitation or the sanction of a warrant, the government has no business studying such actions, much less relying upon them for the purposes of law enforcement. To the extent that certain criminal activities—such as prohibited botanical operations—consume large amounts of energy, inordinate heat loss is evidence of some slight weight.

chewed an examination of the means by which the government obtained Mr. Katz's secrets and instead focused upon the expectations of privacy inhering in the secrets themselves. The fact that the inevitable physical manifestations of protected activity extended into a public area—such that the bug could record the exterior vibrations of the phone booth wall—was of "no constitutional significance." *See Katz,* 389 U.S. at 353, 88 S.Ct. at 512. The (successful) attempt to breach the privacy reasonably afforded by the walls of the phone booth itself sufficed to implicate the Fourth Amendment.

We find nothing in the *Penny–Feeney* analysis upon which to base a distinction between the infrared radiation observed by the thermal imager and the molecular vibrations recorded by a microphone. Each is an exterior physical manifestation of an internal energy flow. Viewed in isolation, each phenomena is of relatively little interest; yet, properly interpreted, both thermal images and molecular vibrations disclose facts about the activities that spawned them. The microphone is of course a much more familiar device—so familiar, in fact, that we often forget that the microphone records not words but the physical manifestations of sound waves. Lack of familiarity, however, cannot justify the severing of the physical phenome-

non from the knowledge that technical prowess can extract from it. To do so would be "bad physics as well as bad law." *See Katz,* 389 U.S. at 362, 88 S.Ct. at 517. *Katz* looked not to the tools employed by the government nor to the phenomena measured by those tools but to the object of the government's efforts; we see no reason to do otherwise here. We acknowledge that the thermal imager monitors and records the heat signatures of the activities ongoing inside a structure. The pertinent inquiry is not, therefore, whether the Defendants retain an expectation of privacy in the "waste heat" radiated from their home but, rather, whether they possess an expectation of privacy in the heat signatures of the activities, intimate or otherwise, that they pursue within their home.[7]

■ We think it plain under *Katz* and its progeny that the Defendants exhibited a subjective expectation of privacy in the heat signatures of their domestic activities. *See Ishmael,* 48 F.3d at 854–55 (holding that defendants possessed subjective expectations of privacy in "waste heat"). The Defendants sought privacy for their actions in the "sanctity of [the] home," *Camara v. Municipal Court,* 387 U.S. 523, 531, 87 S.Ct. 1727, 1732, 18 L.Ed.2d 930 (1967), a location traditionally accorded the most stringent protection under the Fourth Amendment.[8] It is true that the

7. The misplaced focus of the *Penny–Feeney* framework is further illuminated by consideration of the output of a more advanced thermal imager. If it were possible to track the movements of a person through the curtained windows of a darkened room, it seems certain that use of the imager—which would, in effect, be able to "see through walls"—would constitute a search within the meaning of the Fourth Amendment. The output of the device would of necessity intrude upon some "reasonable expectation of privacy"; the input given the device, however, would not differ from the imager at issue here. This advanced imager would operate on the same physical principles utilized by contemporary imagers; its greater capacity to resolve "waste heat" gradients into distinct images would reflect no alteration in the physical phenomenon observed by the device (i.e., the "waste heat") but merely an ability to interpret that phenomenon in a more discerning manner without the aid of a human operator. Yet, the *Penny–Feeney* analysis would accord "waste heat" an expectation of privacy in the one instance but not in the other—an outcome that comports with logic only if the focus of the analysis were to shift from the "waste heat" (in the latter case) to the

information derived from a more perceptive interpretation of that heat (in the former case). We see no reason to embrace such a bifurcated analytical framework. The relevant question in each case should properly be the same: is there an "expectation of privacy" in the heat signatures of activities pursued within the home?

8. *See United States v. Karo,* 468 U.S. 705, 714, 104 S.Ct. 3296, 3302–03, 82 L.Ed.2d 530 (1984) ("[P]rivate residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant...."); *Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."); *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961) ("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."); *see also Soldal v. Cook County,* 506 U.S. 56, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992); *Florida v. Riley,* 488 U.S. 445, 453–55, 109 S.Ct. 693,

Defendants did not take all possible measures to protect themselves from a thermal imager.[9] They did, however, take steps that would have thwarted all but the most sophisticated of surveillance techniques: they grew their plants in the basement of their home, and they took affirmative steps to block the windows looking into that basement. These efforts compare favorably to those undertaken by the defendants in the "overflight" cases, *Riley* and *Ciraolo*, where the Supreme Court found that the defendants had exhibited subjective privacy expectations in preventing ground-level observation despite their failure to take precautions against aerial surveillance. *See Riley*, 488 U.S. at 449–50, 109 S.Ct. at 696–97; *Ciraolo*, 476 U.S. at 211–12, 106 S.Ct. at 1811–12.

We therefore agree with the Fifth Circuit that the Defendants need not have anticipated and guarded against every investigative tool in the government's arsenal. *See Ishmael*, 48 F.3d at 854–55 ("Though the [defendants] did not—indeed, could not—take every precaution against the detection of the hydroponic laboratory [by a thermal imager], the balance of the evidence demonstrates that [they] exhibited a subjective expectation of privacy."). To hold otherwise would leave the privacy of the home at the mercy of the government's ability to exploit technological

advances: the government could always argue that an individual's failure (or inability) to ward off the incursions of the latest scientific innovation forfeits the protection of the Fourth Amendment.[10] *See Katz*, 389 U.S. at 362, 88 S.Ct. at 517 (Harlan, J., concurring). Reasoning of this sort underlay the justly condemned holding of *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928). Despite the passive, non-intrusive character of a wiretap, we do not require that the people manifest an expectation that phone conversations remain inviolate by scrambling the signal. We fail to see why more should be required of those who conduct their affairs in their basements.

■ We turn to the second prong of the *Katz* framework. The government, seeking to minimize the degree to which this machine intrudes upon the "societally reasonable" privacy of the home, has taken pains to emphasize the technical inadequacies of its thermal imager—an argument that proved decisive in *Ford, Myers*, and *Pinson*. The government contends that this device is incapable of resolving images through the walls of a home and in fact does little more than identify hot spots on the exterior of a building. While we take some comfort in such reassurances, we anticipate that this comfort will be ephemer-

698–99, 102 L.Ed.2d 835 (1989) (O'Connor, J., concurring); *California v. Ciraolo*, 476 U.S. 207, 212–13, 106 S.Ct. 1809, 1812–13, 90 L.Ed.2d 210 (1986); *Welsh v. Wisconsin*, 466 U.S. 740, 748–49, 104 S.Ct. 2091, 2096–97, 80 L.Ed.2d 732 (1984); *Steagald v. United States*, 451 U.S. 204, 211–12, 101 S.Ct. 1642, 1647–48, 68 L.Ed.2d 38 (1981); *Katz*, 389 U.S. at 361, 88 S.Ct. at 516–17 (Harlan, J., concurring).

9. It is a matter of some dispute as to whether the Defendants actively vented heat from their home. The district court found that they had not. The government contends that the record demonstrates otherwise. Our review of the facts suggests that the government may well be correct. It appears that the Defendants vented heat from a backup generator through a pipe out one of the windows in the garage. We note, however, that the outlet of the pipe was covered by the camper shell that the Defendants had placed against the wall of the garage. The thermal imager, therefore, did not detect the vented heat directly, but rather recorded a hot spot on the camper shell—an observation that parallels the detection of a non-vented heat source through a wall. It also appears that the Defendants ran a fan of some sort that vented heat from the house. The record

does not indicate whether the imager distinguished the exhaust from this fan from other heat sources within the home or whether the observation of the exhaust heat played a role in the analysis of the thermal data. We note, moreover, that many, perhaps most, homes have exhaust fans of one sort or another. We would be extremely reluctant to hold that use of such a fan forfeits the reasonable expectation of privacy traditionally accorded the home. We therefore conclude that the possibility that the Defendants vented heat from their home does not alter the analysis given above.

10. The Supreme Court has cautioned that the government cannot be allowed to manipulate the *Katz* framework to ensure the constitutionality of its own actions by, for example, consciously using public relations to lower subjective privacy expectations. *See Smith v. Maryland*, 442 U.S. 735, 740 n. 5, 99 S.Ct. 2577, 2580 n. 5, 61 L.Ed.2d 220 (1979); *see also United States v. Taborda*, 635 F.2d 131, 137 (2d Cir.1980). We likewise see no reason why the government should be able to make inroads upon an individual's privacy by arrogating to itself hitherto unrecognized dimensions of privacy before subjective expectations can form.

al. It is in the nature of technology to improve, and we rather doubt that infrared technology is uniquely static. Infrared targeting devices presently employed by the military can apparently identify the movement of a human body through underbrush and foliage. We do not imagine that it would be considerably more difficult to identify (if not, strictly speaking, to watch) two people making love in the privacy of their darkened bedroom.[11] We trust that the government would, in most instances, employ a more capable imager with discretion; nonetheless, the very existence of such discretion would run afoul of the Constitution. See Katz, 389 U.S. at 356–57, 88 S.Ct. at 514. At best, the government invites a re-evaluation of these issues at some indeterminate time in the future; at worst, the government would allow the privacy of the home to hinge upon the outcome of a technological race of measure/counter-measure between the average citizen and the government—a race, we expect, that the people will surely lose.

In any event, we see no need to wait for the future: the thermal imager used here is quite plainly capable of revealing rather specific information regarding the internal activities of the home.[12] The district court found, and we accept, that the thermal readings, when interpreted in the context of the roughly known layout of the house, enabled the government to conclude that the Defendants were raising plants in their basement—a detail of the Defendants' home life that is hard-ly common and that could not have been discerned from the street or from the air by a member of the public. We recognize that the Seventh, Eighth, and Eleventh Circuits have determined that the secrets unveiled by a thermal imager are not sufficiently "intimate" to give rise to a Fourth Amendment violation. See Myers, 46 F.3d at 669–70; Ford, 34 F.3d at 996 (citing Dow Chemical and Riley); Pinson, 24 F.3d at 1059. Our fellow circuits have, we think, misapprehended the most pernicious of the device's capabilities. The machine intrudes upon the privacy of the home not because it records white spots on a dark background but rather because the interpretation of that data allows the government to monitor those domestic activities that generate a significant amount of heat. Thus, while the imager cannot reproduce images or sounds, it nonetheless strips the sanctuary of the home of one vital dimension of its security: the "right to be let alone" from the arbitrary and discretionary monitoring of our actions by government officials.[13] Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting); see also Camara v. Municipal Court, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730–31, 18 L.Ed.2d 930 (1967); United States v. Karo, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984). It is true that the aspect of the Defendants' home life that was uncovered by the imager is not so intimate as the activities of the bed-

---

**11.** The imager used in this case can resolve heat differentials greater than .5 degree Celsius. It would take no great wit to speculate as to the origin of two mild hot spots, commingled, in a bedroom at night. See also United States v. Field, 855 F.Supp. 1518, 1531 (W.D.Wis.1994) (noting that thermal imagers can detect the tear ducts on a face); State v. Young, 123 Wash.2d 173, 867 P.2d 593, 595 (1994) (noting that thermal imagers can detect "a human form through an open [curtained] window when the person is leaning against [the] curtain" or a person leaning against a plywood door).

**12.** It is somewhat disingenuous for the government to plead so forcefully the deficiencies of its machine while simultaneously averring that the output of that device is sufficiently reliable to support the warrant that issued.

**13.** We therefore respectfully disagree with the conclusions reached in Ford, 34 F.3d at 996–97, and Ishmael, 48 F.3d at 856. We believe Ford and Ishmael underestimate the ability of the gov-ernment to interpret thermal data so as to discern indirectly that which is cloaked from visual detection: the character of activities occurring within the walls of the home. We recognize that the government's ability to glean the secrets of the home from thermal data differs from more common methods of surveillance: it requires a two-step process of data collection and explicit data interpretation; it reveals only those activities that generate a sufficient amount of heat; and it is somewhat less precise than visual or aural investigation. However, as noted above, microphones and bugs also incorporate an implicit two-stage process of data collection (the measurement of vibrations) and interpretation (the reproduction of those vibrations into sound); even mundane activities are accorded a presumption of privacy when performed in the privacy of the home; and the government finds the imager sufficiently precise to deem its output valuable—an evaluation to which we defer.

room;[14] we are not prepared to hold, however, that what one does in the privacy of one's basement is undeserving of Fourth Amendment protection. *Compare Riley,* 488 U.S. at 452, 109 S.Ct. at 697–98 (plurality decision) (visual surveillance of the interior of a greenhouse observed "no intimate details connected with the use of the home") (dicta) and *Dow Chemical,* 476 U.S. at 237–39, 106 S.Ct. at 1826–27 (camera surveillance that revealed outlines of commercial buildings did not disclose intimate details of the home) *with Karo,* 468 U.S. at 705, 104 S.Ct. at 3298 (discussed below).[15]

The government asserts that it is not prohibited from using modern technology to extract latent information from the most subtle of physical phenomena. We agree. *See United States v. Knotts,* 460 U.S. 276, 282, 103 S.Ct. 1081, 1085–86, 75 L.Ed.2d 55 (1983). *But compare Dow Chemical,* 476 U.S. at 238, 106 S.Ct. at 1827 ("[S]urveillance of private property by using highly sophisticated surveillance equipment not generally available to the public . . . might be constitutionally proscribed absent a warrant."). That is not to say, however, that the government may employ scientific innovations to make inroads upon the security of the people in their homes. Technological wizardry neither obviates nor supplants a warrant. Words carried out of the house on the wind travel beyond the domain of the Fourth Amendment, but a government official may not replicate a trick of the wind with a parabolic microphone. Confidences unwittingly disclosed to a government mole freely admitted into the sanctuary of the home do not trouble the Constitution, but secrets overheard by a bug may not be procured without a warrant. The government's use of technology must be weighed in the Fourth Amendment balance not because the Constitution constrains the government to employ antiquated surveillance techniques but because the march of science over the course of this century has time and again laid bare secrets that society had (erroneously) assumed to lie safely beyond the perception of the government. *See Olmstead,* 277 U.S. at 473, 474–79, 48 S.Ct. at 570, 570–73 (Brandeis, J., dissenting) ("Subtler and more far-reaching means of invading privacy have become available to the Government. Discovery and invention have made it possible for the Government, by means far more effective than stretching upon the rack, to obtain disclosure in court of what is whispered in the closet.").[16] *Katz,* read in the light of the abandoned reasoning of the *Olmstead* majority, confirms that it is those *expectations* of privacy that define the contours of the Fourth Amendment—not the actual capabilities of the government's arsenal of investigatory methods.

We acknowledge that no explicit societal expectation of privacy inheres in the heat signatures of activity within the home. We rather doubt that society is aware that heat signatures can be read with any greater accuracy than tea leaves. The contours of the privacy expressly guaranteed the home by the Fourth Amendment are not, however, determined by the outcome of a game of hide-and-seek played by the government and

14. It seems quite possible that, given only a general knowledge of a home's floor plan, a thermal imager could be used to identify a host of activities typical of virtually every home in this country: the use of a shower, bath, or hot tub; the running of one's dishwasher or clothes dryer; or the baking of bread, or a turkey, or cookies. *See United States v. Field,* 855 F.Supp. 1518, 1519 (W.D.Wis.1994) (noting that a thermal imager had detected the heat admitted from a dehumidifier in a closet). These are mundane activities, to be sure, but activities nonetheless conducted in the domestic enclave. The routine is no more the government's legitimate business than is the intimate. The text of the Fourth Amendment encompasses "persons, houses, papers, and effects." U.S. Const. amend. IV. It does not, by its terms, afford greater protection to the study than to the kitchen, or to a diary than to a contract, or to an undergarment than to a pocket watch.

15. *Compare also Arizona v. Hicks,* 480 U.S. 321, 325, 107 S.Ct. 1149, 1152–53, 94 L.Ed.2d 347 (1987) ("It matters not that the search uncovered nothing of any great personal value to respondent—serial numbers rather than . . . letters or photographs. A search is a search, even if it happens to disclose nothing but the bottom of a turntable.").

16. *See also Katz,* 389 U.S. at 360–62, 88 S.Ct. at 516–17 (Harlan, J., concurring); *Dow Chemical,* 476 U.S. at 238–39, 106 S.Ct. at 1826–27; *Ishmael,* 48 F.3d at 855; *Taborda,* 635 F.2d at 138–39; *United States v. Agapito,* 620 F.2d 324, 329–30 (2d Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980).

the people. It is abundantly clear that the people retain a "reasonable expectation of privacy" in the undetected, unmonitored performance of those domestic activities that are not knowingly exposed to the public. *See Dow Chemical,* 476 U.S. at 236, 106 S.Ct. at 1825 ("Dow plainly has a reasonable, legitimate, and objective expectation of privacy within the interior of its covered buildings."); *United States v. Karo,* 468 U.S. 705, 714, 104 S.Ct. 3296, 3303, 82 L.Ed.2d 530 (1984) ("At the risk of belaboring the obvious, ... [the individual's expectation in the privacy of a residence] is plainly one that society is prepared to recognize as reasonable.").[17] We do not think the mere fact that the government utilized a novel or uncommon method of surveillance suffices to carve an exception from the general societal expectation that deeds conducted in the privacy of one's basement will in fact remain private unless a warrant is obtained.[18] *Compare Karo,* 468 U.S. at 705, 104 S.Ct. at 3298 (discussed below); *Riley,* 488 U.S. at 454–55, 109 S.Ct. at 698–99 (O'Connor, J., concurring) (analyzing helicopter surveillance to determine if such activity were sufficiently regular or commonplace to support a finding that privacy from this form of aerial observation was not objectively reasonable). If the refuge of the home fails to ward off unimagined threats to the privacy of the people, the "security" explicitly mandated by the Constitution will wither as the government supplants older, more blunt techniques with more subtle, "passive" depredations. This result would comport neither with the plain language of the Amendment nor with the Supreme Court's post-*Katz* conception of the Fourth Amendment. We therefore hold that the use of a thermal imager upon the home intrudes upon an expectation of privacy that society deems reasonable.

■ We likewise conclude that the Defendants did not "knowingly expose" the heat signatures of their botanical endeavors to the public so as to place those activities in "plain view." The Supreme Court, in supporting its holdings in the aerial surveillance cases, took pains to emphasize that the details noted by government officials were observable by the naked eye or by a conventional, commonly available camera.[19] That is certainly not the case here. More fundamentally, the essence

17. *See also Oliver v. United States,* 466 U.S. 170, 178, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984) ("The [Fourth] Amendment reflects the recognition of the Framers that certain enclaves should be free from arbitrary government interference.... [T]he Court since the enactment of the [] Amendment has stressed 'the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.'" (*quoting Payton,* 445 U.S. at 601, 100 S.Ct. at 1387–88 (Powell, J., concurring))); *Katz,* 389 U.S. at 361, 88 S.Ct. at 516–17; *Silverman,* 365 U.S. at 511–12, 81 S.Ct. at 682–83.

18. "Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing.... When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948) (Jackson, J.).

19. *See Riley,* 488 U.S. at 451, 109 S.Ct. at 697 ("Any member of the public could legally have been flying over Riley's property in a helicopter ... and could have observed Riley's greenhouse."); *id.* at 454–55, 109 S.Ct. at 698–99 (O'Connor, J., concurring); *Ciraolo,* 476 U.S. at 213–14, 106 S.Ct. at 1813 ("[The officers] were able to observe plants readily discernible to the naked eye.... Any member of the public flying in this airspace who glanced down could have seen everything that these officers observed."); *id.* at 214–15, 106 S.Ct. at 1813–14 ("Justice Harlan's observations about future electronic developments ... were plainly not aimed at *simple visual observations* from a public place." (emphasis added)); *Dow Chem.,* 476 U.S. at 229, 231, 106 S.Ct. at 1822, 1823 ("Any person with an airplane and an aerial camera could readily duplicate them."); *id.* at 238, 106 S.Ct. at 1827 ("Although [the photographs] undoubtedly give EPA more detailed information than naked-eye views, they remain limited to an outline of the facility's buildings and equipment.").

We recognize that the use of illumination or binoculars to improve the visibility of an object already in plain view has been held constitutional. *See Texas v. Brown,* 460 U.S. 730, 740, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983) (plurality opinion); *United States v. Lee,* 274 U.S. 559, 563, 47 S.Ct. 746, 748, 71 L.Ed. 1202 (1927); *Fullbright v. United States,* 392 F.2d 432, 434–35 (10th Cir.), *cert. denied,* 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101 (1968). *But see United States v. Taborda,* 635 F.2d 131, 137–39 (2d Cir.1980) (holding that telescopic observation of the home "impair[s]" a legitimate expectation of privacy"). There is, nonetheless, an obvious distinction between common tools that enhance vision and a sophisticated instrument that observes infrared radiation.

of the "plain view" exception is predicated upon the *"knowing[ ] exposure"* of information to the public. *See Ciraolo*, 476 U.S. at 215, 106 S.Ct. at 1813–14 (*quoting Katz*, 389 U.S. at 361, 88 S.Ct. at 516–17 (Harlan, J., concurring)). We hesitate to say that an individual "knowingly exposes" that which goes on in the basement of the home. Although the thermal radiation observed by the machine propagates through the walls of the home into the public sphere, the Constitution demands no "more than the 'precautions customarily taken by those seeking privacy.' " *Riley*, 488 U.S. at 454, 109 S.Ct. at 699 (O'Connor, J., concurring) (citation omitted).[20] It is hardly "customary" for an individual to seek privacy by controlling heat emissions, nor do we think that a person's right to be secure inside her or his home should hinge on the insulating capacity of the walls. We believe that an individual is "entitled to assume" that the heat signatures of domestic conduct will remain unmonitored. *See Ciraolo*, 476 U.S. at 214–15, 106 S.Ct. at 1813–14; *cf. Riley*, 488 U.S. at 451, 109 S.Ct. at 697. We therefore decline to extend the "plain view" exception to encompass thermal imagery.[21]

Our holding finds ample support in *United States v. Karo*, a case addressed neither by the government nor by our fellow circuit courts.[22] In *Karo*, an electronic beeper had been placed inside a can of ether; the government used the beeper to track the movements of the can over the course of several months. The defendants in *Karo* were eventually followed to a private residence suspected (correctly, as it turned out) of concealing a drug lab. Activation of the beeper revealed that the can of ether had been stored in the suspect home. At trial the defendants contended that the warrantless use of the beeper impermissibly intruded into the privacy of the home. The Supreme Court, distinguishing *United States v. Knotts*, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), agreed:

> In this case, had a DEA agent thought it useful to enter the Taos residence to verify that the ether was actually in the house and had he done so surreptitiously and without a warrant, there is little doubt that he would have engaged in an unreasonable search within the meaning of the Fourth Amendment. For purposes of the Amendment, the result is the same where, without a warrant, the Government surreptitiously employs an electronic device to obtain information that it could not have obtained by observation from outside the curtilage of the house. The beeper tells the agent that a particular article is actually located at a particular time in the private residence....
>
> The monitoring of an electronic device such as the beeper is, of course, less intrusive than a full-scale search, but it does reveal a critical fact about the interior of the premises that the Government is extremely interested in knowing and that it could not have otherwise obtained without a warrant. The case is thus not like *Knotts*, for there the beeper told the authorities nothing about the interior of Knotts' cabin. The information obtained in *Knotts* was "voluntarily conveyed to anyone who wanted to look ...," 460 U.S. at 281 [103 S.Ct. at 1085]; here, as we have said, the monitoring indicated that

---

**20.** It is therefore irrelevant whether the Defendants vented heat from their home. Such venting may well ease the observation of heat signatures by a thermal imager. However, to say that such exposure was "knowing" would distort the meaning of the term to an unreasonable degree. In any event, an individual need not swelter in an unventilated home as the cost of taking "customar[y] precautions" against government monitoring.

**21.** We note, lastly, that the "plain view" exception has been strictly interpreted: movement of a piece of stereo equipment by a few inches has been held sufficient to take the observation of serial numbers outside the realm of the excep-

tion. *See Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

**22.** In fact, the contrary analyses offered by other courts cite instead to *United States v. Knotts*, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), a case expressly distinguished by the Supreme Court in *Karo* and rejected as inappropriate to the home. *See, e.g., Ishmael*, 48 F.3d at 855; *Ford*, 34 F.3d at 997; *Penny–Feeney*, 773 F.Supp. at 226. In *Knotts*, the Supreme Court upheld the use of a beeper to monitor movements outside a home. In light of *Karo*, *Knotts* must be considered wholly inapplicable to an analysis of activities within the home.

the beeper was inside the house, a fact that could not have been visually verified. 468 U.S. at 715, 104 S.Ct. at 3303.

In *Karo*, therefore, the revelation of *a single detail* about the interior of the home—whether or not the beeper was still inside the home—sufficed to violate the Fourth Amendment. There is no reason why the protection of the Fourth Amendment should be less demanding in the case at hand. The thermal imager detected hot spots that, interpreted in the light of the government's expertise, alerted the government to the likely presence of a hidden cultivation operation—a fact, like that disclosed by the beeper in *Karo*, that was of "extreme interest" to the government and that could not have been "visually verified" from beyond the curtilage.[23] We agree with the Fifth Circuit that the intrusiveness of the imager is similar to that of a beeper, *see Ishmael*, 48 F.3d at 855–56—a level of intrusion that *Karo* held to violate society's objectively reasonable expectations of privacy in the home. *See also Young*, 867 P.2d at 602 (reaching a similar result).

We find nothing to dissuade us in the other cases relied upon by our fellow circuits. The abandoned waste analogy central to the *Penny–Feeney* analysis is largely inapposite to our characterization of the relevant issues. *California v. Greenwood*, in any event, turned upon two factors: the voluntary nature of the relinquishment of trash into the hands of third parties and the frequency with which people or animals rummage through curbside garbage bags. *See* 486 U.S. at 40–41, 108 S.Ct. at 1628–29. It is neither common nor expected for homes to be scanned with thermal imagers, nor can the process by which heat signatures escape through the walls of the home be termed "voluntary" within the common usage of that word.

Heat loss and heat conduction (or radiation) obey the laws of physics and are not phenomena over which an individual customarily exerts control.[24] An individual no more chooses to have his or her home emit infrared radiation than she or he chooses to absorb or reflect visible light, but we have never heard the process of sight described in terms of abandoned photons.[25] *See Young*, 867 P.2d at 602–03.

The analogy to the pen register approved in *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), fails to sway us for similar reasons. The Court in *Smith* concluded, first, that telephone users know that the phone company, for its own purposes, records the numbers dialed on a given phone; and second, that dialing information was therefore voluntarily turned over to a third party. The former conclusion defeated the defendant's subjective expectation of privacy; the latter demonstrated that any expectation was unreasonable in any event. *See* 442 U.S. at 742–45, 99 S.Ct. at 2581–83. We have concluded that individuals neither anticipate thermal imagery nor voluntarily disclose thermal signatures to the public. *Smith* is therefore inapplicable here.

The dog sniff held constitutional in *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), offers a more precise comparison. The dog sniff, like the thermal imager, extracts information about the interior of an object solely from an analysis of external physical phenomena. The dog sniff, however, detects *only* the presence of narcotics that an individual cannot lawfully possess; the dog sniff therefore *cannot* reveal information about conduct or activity that an individual has a right to pursue. *See* 462 U.S. at 707, 103 S.Ct. at 2644–45. The thermal imager is far less discriminating in its ability to

---

**23.** The thermal observations were, admittedly, not as conclusive as the beeper output; yet, the district court found that "[the imager] showed hot spots which caused the agents to suspect in all probability the premises were being used for a marijuana grow operation," R.Vol. II, at 192–93, and the government deemed (and deems) its interpretation of the thermal readings sufficiently reliable to offer it as support for the search warrant that was eventually obtained. This distinction is therefore not a meaningful one.

**24.** We note, moreover, that in insulating a structure an individual implements a quite practical and reasonable measure designed to minimize heat loss. Our familiarity with the climate of Wyoming leads us to believe that the Defendants' home was in fact insulated.

**25.** This is not to say that a heat signature might not be in "plain view" if, for example, it were located in an "open field." *Compare Ishmael*, 48 F.3d 850. We have already held that the heat signatures located within the Defendants' home were not in plain view.

identify *illegal* activity, and it empowers the government to detect a vast array of innocent conduct.[26] The Court, in holding a dog sniff to be a non-search within the meaning of the Fourth Amendment, emphasized that the unique qualities of the dog sniff rendered it *"sui generis." Id.* As the imager lacks the precision of the dog sniff, we decline to extend *Place* to allow the warrantless use of thermal imagers upon a home.[27] *See Young,* 867 P.2d at 603–04.

The science of investigation has progressed to the point where the government can now divine useful data from clues so slight as to be beyond the awareness of the average citizen. We do not think, however, that subtlety can uncover that which the Constitution undoubtedly shields from the less refined tools of days past. Use of a thermal imager enables the government to discover that which is shielded from the public by the walls of the home. We reject the government's contention that its technical wizardry should free it from the restraints mandated by the Fourth Amendment. "Indiscriminate monitoring of property that has been withdrawn from public view would present far too serious a threat to privacy interests in the home to escape entirely some sort of Fourth Amendment oversight." *Karo,* 468 U.S. at 716, 104 S.Ct. at 3304.[28] We therefore hold

that the government must obtain a warrant before scanning a home with a thermal imager.[29]

■ The government does not dispute that it failed to obtain a warrant before turning a thermal imager upon the Defendants' home. In light of our holding, this was an unconstitutional warrantless search. The unconstitutionally obtained information gleaned from the thermal analysis was, in turn, used to support the warrant that was ultimately procured. We must therefore consider whether the affidavit upon which the warrant request was based contains sufficient untainted evidence to validate the warrant. *See, e.g., Karo,* 468 U.S. at 719, 104 S.Ct. at 3305–06. "In evaluating claims of warrant deficiencies, we need only determine whether the issuing magistrate had 'a substantial basis for concluding that probable cause existed.'" *United States v. Corral,* 970 F.2d 719, 726 (10th Cir.1992) (*quoting Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527 (1983)). We review the district court's findings of fact for clear error, and read the evidence in the light most favorable to the government. *United States v. Donnes,* 947 F.2d 1430, 1432 (10th Cir.1991).

---

26. The Defendants could, for example, have been growing African violets in the basement—a perfectly legal and not uncommon avocation.

27. We note, furthermore, that the luggage examined in *Place,* far from being secreted in the basement of a home, had been voluntarily brought into a public place. The Second Circuit has held that a dog sniff may not be used to detect narcotics through the door of a residence. *United States v. Thomas,* 757 F.2d 1359, 1367 (2d Cir.) ("With a trained dog police may obtain information about what is inside a dwelling that they could not derive from the use of their own senses.... Here the defendant had a legitimate expectation that the contents of his closed apartment would remain private, that they could not be "sensed" from outside his door. Use of the trained dog impermissibly intruded on that legitimate expectation."), *cert. denied sub nom.,* 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985); *cf. United States v. Garcia,* 42 F.3d 604, 606 (10th Cir.1994) (upholding dog sniff of a sleeper compartment and distinguishing *Thomas* as turning on the "heightened expectation of privacy inside a dwelling"), *cert. denied,* — U.S. ——, 115 S.Ct. 1713, 131 L.Ed.2d 573 (1995). Criticism of *Thomas* has emphasized that dog sniffs detect only contraband. *See, e.g., United States v. Lin-*

*genfelter,* 997 F.2d 632, 638 (9th Cir.1993). Such criticism is not relevant in this case.

28. "A man can still control a small part of his environment, his house; he can retreat thence from outsiders, secure in the knowledge that they cannot get at him without disobeying the Constitution. That is still a sizable hunk of liberty—worth protecting from encroachment. A sane, decent, civilized society must provide some such oasis, some shelter from public scrutiny, some insulated enclosure, some enclave, some inviolate place which is a man's castle." *United States v. On Lee,* 193 F.2d 306, 315–16 (2d Cir. 1951) (Frank, J., dissenting), *aff'd,* 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952).

29. We need not address the constitutionality of a thermal scan of a business or a building beyond the curtilage. *Compare Ishmael,* 48 F.3d at 855–57 (holding constitutional the warrantless thermal observation of a building beyond the curtilage). Whether the lowered expectation of privacy in such structures would sufficiently ameliorate the intrusion of a thermal scan is a question that properly awaits a different case.

■ The district court found, and we accept, that the contested warrant was predicated upon the following facts. Information obtained from the Defendants' landlady indicated that the Defendants had installed in the garage an electric generator that they ran day and night; that the Defendants had rewired the basement's electrical system and installed new lighting in the basement to grow vegetables (or so they said); that, while visiting the house, she had noted a strong, musty odor in the basement; that the Defendants consistently paid their rent in cash; and that the Defendants had on one occasion denied her entrance to the house and had only reluctantly allowed her to enter on another occasion. The Defendants had no identifiable employment or other means of support. The Defendants consumed roughly twice as much electricity as the typical household. A local electrician had reported that the Defendants had requested that he make suspicious modifications to the basement's electrical system; the electrician, believing the rewiring to be unsafe and doubting the Defendants' rationale for their request,[30] had refused. Finally, the Defendants, in refusing to allow a local insurance agent to enter the house, had behaved in a manner that had made the agent fear for his safety; the agent also indicated that he had seen wheelbarrows and sacks of soil outside the doors leading to the basement.

We conclude that these facts, read in the light most favorable to the government, provide more than ample support for the warrant that was issued. The totality of the evidence substantially supports the conclusion that there was "a fair probability that contraband or evidence of a crime" would be found in the Defendants' home. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). The motion to suppress was therefore properly denied.

We HOLD that the warrantless use of a thermal imager upon a home violates the Fourth Amendment of the Constitution. We nonetheless AFFIRM the district court's decision on other grounds.

AFFIRMED.

---

30. The Defendants had told him that they wished to build a sound stage on top of an indoor swimming pool located in the basement.

KANE, Senior District Judge, concurring:

### I.

I concur in the conclusion of the majority opinion affirming the district court's denial of the motion to suppress. I agree the warrant was issued on more than ample evidence to support probable cause irrespective of the data and opinions drawn from the unauthorized thermal scan of Defendants' home. Moreover, I agree use of a thermal imager under these circumstances is a search within the meaning of the Fourth Amendment thus requiring here the issuance of a warrant authorizing use of the thermal imager rather than attempting to use the results of the thermal scan to obtain a warrant.

Current binding authority requires an analysis of privacy interests in order to determine whether an illegal search and seizure occurred. Complying with this mandate, the majority opinion constitutes a skilled application of the doctrines established in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). I write this concurring opinion because there is a split among the circuits that may provide the opportunity for a fundamental reconsideration of the exclusionary rule itself.

### II. *The Exclusionary Rule*

The exclusionary rule was judicially created and cannot be found in the text of the Constitution. The rule seriously compromises the truth-finding role of the courts by omitting facts in an effort to preserve and protect constitutional rights. Controversy has enshrouded the rule since its inception because of its ambiguous premises and intended purposes.

The astounding number of exceptions to the rule provokes questions about the value of its existence and the efficacy of its applications. Moreover, I join others in asserting alternatives to the exclusionary rule would better serve to enforce the Constitution whilst enhancing the courts' role in determining guilt or innocence.

Indeed, the numerous exceptions to the rule carved out by the Court from 1961 to the present have excised its ability to serve its purpose as well. If exclusion of otherwise reliable evidence is meant to vivify the Constitution, none of these exceptions should exist. Moreover, if judicial integrity is still considered even a partial justification for the exclusionary rule, courts should be required to suppress illegally obtained evidence irrespective of whether an objection is raised or in spite of a defendant's consent to its use at trial.[1]

### A. Justification for the Rule—Deterrence

The currently favored rationale for applying the exclusionary rule, police deterrence, wistfully assumes officers will follow constitutional guidelines instead of having evidence suppressed and criminals freed due to illegal searches. This justification quickly became the vindication for the exclusionary rule. Just four years after *Mapp*, the Court determined *Mapp*'s holding was not fully retroactive because a retrospective application would not serve the rule's main purpose of policing the police.[2] In 1974, the Court again noted "[t]he purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim ... the rule's prime purpose is to deter future unlawful police conduct...."[3] Indeed, to my reckoning, no other rationale for the rule is currently offered.

The argument that the exclusionary rule deters police misconduct is made of whole cloth. Indeed, one must assume there is any warp or woof to it at all. In *United States v. Leon*, 468 U.S. 897, 918, 104 S.Ct. 3405, 3418, 82 L.Ed.2d 677 (1984), the Court stressed the lack of empirical data to determine the effectiveness of the deterrence theory. Discussion is limited to supposition.

It is difficult to imagine police are not more aware of constitutional constraints since the rule's inception even if empirical data does not exist. Most likely, however, it is the education and formal police training

concerning the rule and not the rule itself which provide such deterrence as might exist. The rule's adoption proliferated police training procedures. The presence of proper training, however, as a constituent element of the executive branch of government's effort to regard the charter of its own existence, need not disappear even if the exclusionary rule does.

Other remedies, such as civil damages, are necessary to offer protection to innocent victims of illegal searches. The only people currently benefiting from the exclusionary rule are those who, at least by a probable cause determination, have done something illegal and have that evidence suppressed from trial. The doctrine thereby transforms the Fourth Amendment from a constitutional safeguard to a tool for miscreants to avoid just conviction.

Practical experience suggests the exclusionary rule is illusory as a deterrent. Officers, both zealous and overzealous, receive credit for the initial arrest and approval from their peers in the station house, not from the results of a trial or court hearing which may take place months or even years after the evidence is seized.

The exclusionary rule operates only in the small fraction of police work which results in prosecution. It is understandable that an officer would be more concerned with crime prevention, "visible enforcement" or other goals such as recovering stolen property or removing narcotics from circulation than the rules involving evidence at trial.

The fluctuating and exception-laden search and seizure law does not deter police officers from engaging in illegal searches; it confuses them. There simply are no practical working standards for officers compelled to make immediate decisions under exceedingly stressful conditions. Does any jurist seriously believe an officer evaluates privacy interests with the imprecise quiddities articulated by courts when making an arrest or conducting a search of a crime scene?

---

1. *Stone v. Powell*, 428 U.S. 465, 485, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976) (observing the "imperative of judicial integrity" justification for the rule plays a limited role in its application).

2. *Linkletter v. Walker*, 381 U.S. 618, 635–38, 85 S.Ct. 1731, 1741–42, 14 L.Ed.2d 601 (1965).

3. *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974).

Perhaps more to the point, police officers do not face sanctions as a result of conducting an illegal search. Instead of deterring the offending officer, the rule straps prosecutors who were not involved in the violation by weakening the case against the defendant.

Most importantly, the exclusionary rule has harmful effects on society: Guilty defendants are freed, the truth finding process is distorted, aberrant results subject the courts to public scorn and ridicule, the focus of trial shifts from guilt or innocence to procedural niceties, court costs increase through delay and perjury becomes tempting to the very people supposed to be exemplars of law and order.

### B. *Exceptions*

#### 1. The expectation of privacy

Exceptions were found almost as soon as the exclusionary rule was adopted in *Weeks*. A mere five years later the Court implemented a "but-for" test ruling any evidence which would not have been discovered but-for the constitutional violation was inadmissible. *Silverthorne Lumber Co., v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1919).[4] A persistent pattern to narrow the exclusionary rule's scope through exceptions has emerged. These exceptions, confusing, if indeed not utterly mystifying to officers in the crucible of action, likewise raise questions about the need for and logic of the rule's existence.

The Court has clipped the exclusionary rule by limiting the threshold standing requirement. A defendant only has standing to challenge the admission of evidence if his own constitutional rights are violated. *United States v. Salvucci*, 448 U.S. 83, 86–87, 100 S.Ct. 2547, 2550–51, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 134, 99 S.Ct. 421, 425–26, 58 L.Ed.2d 387 (1978). The automatic standing test set out in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), was eliminated in *Rakas* where the Court held a claimant must have a "legitimate expectation of privacy" as a prerequisite for challenging a search and seizure. 439 U.S. at 140, 148–50, 99 S.Ct. at 428–29, 432–34.

A two-pronged test created in *United States v. Salvucci*, 448 U.S. 83, 93, 100 S.Ct. 2547, 2553–54, 65 L.Ed.2d 619 (1980), determined whether a "legitimate expectation of privacy" existed. In order to satisfy this test, the claimant must establish a possessory interest in the items seized and a legitimate expectation of privacy in the area searched. Thus, another means of restricting the exclusionary rule is at hand. By not finding an expectation of privacy, the standing of the claimant is removed and the judge may avoid suppressing the illegally obtained evidence.

No legitimate expectation of privacy can be found when information is seized from a third party and used against the claimant. *United States v. White*, 401 U.S. 745, 751–52, 91 S.Ct. 1122, 1125–26, 28 L.Ed.2d 453 (1971). In the Court's eyes, the defendant took a risk by sharing the information with another. A defendant also has no expectation of privacy when a third party's Fourth Amendment rights are violated in order to obtain evidence against the defendant. *United States v. Payner*, 447 U.S. 727, 735, 100 S.Ct. 2439, 2446, 65 L.Ed.2d 468 (1980). Precisely how these rules enhance the exclusionary rule as a means of deterring violations of the Fourth Amendment or promoting judicial integrity beggars the imagination.

#### 2. The impeachment exception

Even before the defining *Mapp* decision, the Court in *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), created an impeachment exception to the exclusionary rule. Under *Walder*, illegally seized evidence may be used to impeach a defendant's testimony given on direct examination or cross-examination reasonably suggested by the direct examination. Because a defendant's right to testify does not include the right of perjury, the Court reasoned even illegally obtained evidence should be allowed to impeach testimony. *Harris v. New York*, 401 U.S. 222, 224–26, 91 S.Ct. 643, 645–46, 28 L.Ed.2d 1 (1971). Curiously, this exception does not extend to a defendant's witnesses. *See James v. Illinois*, 493 U.S. 307, 313, 110

---

**4.** This test was eventually overruled in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), which held the but-for test was too restrictive.

S.Ct. 648, 652, 107 L.Ed.2d 676 (1990). The rationales given are that witnesses should be sufficiently deterred by the prospect of being prosecuted for perjury and to allow the use of illegally obtained evidence against witnesses might chill the defendant's right to present a defense. *Id.* at 314–316.

### 3. Harmless error

Another exception to the exclusionary rule is the harmless error doctrine enunciated in *Fahy v. Conn,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963).[5] There, the Court decided the admission of tainted evidence was harmless if the effect of that evidence was insignificant to the conviction in light of all the legally obtained evidence presented.

### 4. Good faith

In *Leon,* 468 U.S. at 922–23, 104 S.Ct. at 3420–21, the Court created the good faith exception to the rule by holding that evidence seized by an officer, who obtained a search warrant in good faith, was admissible even if the warrant was later found to lack probable cause. Writing for the Court, Justice White reiterated its previous finding that deterring police from violating the Constitution was the primary purpose for the exclusionary rule.

Once that premise was accepted, the good-faith exception became ineluctable. "Where the official action was pursued in complete good-faith ... the deterrence rationale loses much of its force" because the officer already attempted to protect the citizen's constitutional rights. *Id.* at 919, 104 S.Ct. at 3418–19 (quoting *United States v. Peltier,* 422 U.S. 531, 539, 95 S.Ct. 2313, 2318, 45 L.Ed.2d 374 (1975)). This was especially true where the officer understandably assumed he was following the law by relying on a facially valid warrant.

Justice White's opinion emphasized the costs of the exclusionary rule in order to justify this expansive exception. Believing exceptions to the rule were inevitable, he stated an "unbending application of the exclusionary sanction ... would impede unacceptably the truth-finding function of judge and jury." *Id.* at 907, 104 S.Ct. at 3412 (quoting *Payner,* 447 U.S. at 734, 100 S.Ct. at

2445–46). In addition, "indiscriminate application of the exclusionary rule ... may well 'generate disrespect for the law and administration of justice.'" *Id.* at 908, 104 S.Ct. at 3412 (quoting *Stone,* 428 U.S. at 490, 96 S.Ct. at 3050). These concerns, in conjunction with the lack of deterrence applicable in good-faith cases, led the court to hold the "marginal or non-existent benefits" of suppressing evidence obtained through a subsequently invalid warrant did not justify the costs of exclusion. *Id.* at 922, 104 S.Ct. at 3420.

### 5. Contextual exceptions

In addition to the major doctrinal exceptions mentioned, the Court also prohibited the exclusionary rule from various settings. In *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561, the Court held the rule was inapplicable in grand jury proceedings because grand jury questions based on illegally obtained evidence "work no new Fourth Amendment wrong." *Id.* at 354, 94 S.Ct. at 623. In addition, the Court held the rule could not be used in federal civil cases, *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), or deportation proceedings. *Immigration and Naturalization Services v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1982). The Court also proscribed federal review of state court exclusionary rule determinations by refusing to grant federal habeas corpus relief where the state was found to have provided a "full and fair" opportunity to litigate the constitutionally based objection. *Stone,* 428 U.S. at 494, 96 S.Ct. at 3052. Finally, the exigency exception allows police to search private residences without a warrant during emergencies. *Johnson v. United States,* 333 U.S. 10, 14–15, 68 S.Ct. 367, 369–70, 92 L.Ed. 436 (1948).

Attenuation, while not specifically connected to the Fourth Amendment, is a related exclusionary principle involving sanctions for violations of constitutional protections. The doctrine concerns direct or derivative evidence obtained from an earlier constitutional violation. This secondary evidence is often referred to as the "fruit of the poisonous

---

5. *See also Chambers v. Maroney,* 399 U.S. 42, 53, 90 S.Ct. 1975, 1982, 26 L.Ed.2d 419 (1970).

tree." Thus, where police illegally conduct a search without a warrant, the evidence obtained is tainted. The tainted evidence may provide probable cause warranting a second search, but any evidence found from the second search is excludable because it is considered the "fruit of the poisonous tree." *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939).

Again, the Court quickly developed exceptions to the compass of exclusion under the "poisonous tree" doctrine so as to remove the original taint and thus make the consequent evidence admissible at trial. "A court may admit evidence that would not have been discovered but for official misconduct if the causal connection between the illegal conduct and the acquisition of the evidence is so attenuated that the evidence is 'purge[d of] the primary taint.'"[6]

### III. *Conclusion*

The exclusionary rule began with myriad purposes which were then whittled down to one remaining justification, the efficacy of which is entirely speculative. More to the point, the numerous exceptions to the rule negate whatever effect it might have in the best of circumstances. The rule remains in Fourth Amendment law as a vestige of the fundamental desire to enforce individual constitutional rights and reign in excessive governmental intrusion into those rights.

As Chief Justice Burger wrote in his *Bivens* dissent, "I do not propose, however, that we abandon the suppression doctrine until some meaningful alternative can be developed ... the public interest would be poorly served if law enforcement officials were suddenly to gain the impression ... that all constitutional restraints ... had somehow been removed." *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 420–21, 91 S.Ct. 1999, 2017, 29 L.Ed.2d 619 (1971). *Bivens* itself developed at least one alternative to the exclusionary rule. Since then numerous others have been articulated which would serve to create a more effective and just means of protecting constitutional rights. My criticism of the exclusionary rule is based on its

failure to achieve an essential and laudable goal and not a disagreement with the goal itself.

Civil sanctions will only be effective if they have a direct impact on the law enforcement officials who might conduct illegal searches and seizures. Although the *Bivens* decision held that Fourth Amendment violations committed by a federal officer in his official capacity give rise to a tort action for damages, it did not address the issue of qualified immunity. If the federal officer's search is considered a discretionary function which is not clearly unconstitutional, the tort action will be dismissed under the qualified immunity doctrine. Moreover, the practice of government or police union indemnification of such officers removes the burden of direct impact so that tort liability is not an effective restraint.

The fact that independent disciplinary review boards are consistently opposed by police organizations suggests their use should be more seriously considered. Such a board could have broad powers to suspend or dismiss offending officers and require further training and education to prevent future violations. More than one study suggests that a two-week suspension without pay would be a more efficacious deterrent than application of the exclusionary rule. So, too, as Congress has legislated schemes that license stevedores, interstate truck drivers and airplane pilots, it could establish an effective licensing system for those charged with law enforcement responsibilities.

The balancing approach used by the Court in *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), could be extended to a case-by-case method that would sever Fourth Amendment rights from remedies, allowing the court to determine the wisdom of suppressing evidence according to each situation. Quite clearly, the seriousness of the alleged crime and the degree of harm visited upon victims should be evaluated as constituent considerations. While judges must decide whether suppression is appropriate, a rule of reason subject to an abuse of

---

6. Deborah Connor, *The Exclusionary Rule, 23rd Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeal, 1992–*

*93* 82 Geo.L.J. 755, 760 (1994) (quoting *Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 418).

discretion review standard should apply instead of the present rule which excludes the exercise of it.

The questionable deterrent effect and the increasing number of exceptions to it transform the exclusionary rule into a doctrine without substance. It may be that the Emperor is not entirely naked, but it is indeed time to observe just what he is wearing.